652 So.2d 1005 (1994)
Donna S. MAEDER, wife of/and Robert L. Maeder, individually and on Behalf of his Minor Children, Shaun Maeder and Karla Maeder
v.
Joanne WILLIAMS, Jon Uzee, City of New Orleans, and State Farm Mutual Automobile Insurance Company.
No. 94-CA-0754.
Court of Appeal of Louisiana, Fourth Circuit.
November 30, 1994.
*1007 James S. Rees, III, Kathleen E. Simon, Simon & Rees, Covington, for plaintiffs/appellees.
Richard P. Ieyoub, Atty. Gen., Edward M. Campbell, Asst. Atty. Gen., Baton Rouge, for defendants/appellants.
Before CIACCIO, LOBRANO and PLOTKIN, JJ.
LOBRANO, Judge.
This appeal arises from a judgment in favor of plaintiffs, Robert L. Maeder and Donna S. Maeder, and against defendant, The Louisiana Department of Transportation and Development, for injuries sustained by plaintiffs when their vehicle was struck by an ambulance on Louisiana Highway 46, commonly known in the City of New Orleans as St. Claude Avenue.

FACTS AND PROCEDURAL HISTORY:
On March 7, 1988 at approximately 6:45 a.m. Robert L. Maeder was driving his van in a westerly direction down St. Claude Avenue toward downtown New Orleans. Donna S. Meader was seated in the front passenger seat. Both were wearing their seat belts. The Maeders were enroute to their place of employment, The Veterans Administration Medical Center. The weather conditions were very poor. A dense fog blanketed the entire area. Because of poor visibility, Mr. Meader was driving at between 20 and 23 miles per hour. As Meader proceeded through the intersection of St. Claude and Delery Street, his vehicle was struck on the right passenger side by an ambulance owned by the Department of Health for the City of New Orleans. The ambulance entered from Delery Street and was operated by Joanne Williams. John Uzee, another employee, was a passenger. Both Williams and Uzee were emergency medical technicians responding to a Code 2 (life threatening call) wherein it was reported that a Regional Transit Authority bus driver had been stabbed.
The impact of the collision propelled the Meader vehicle onto the median and into a light post, pinning the Maeders inside the vehicle where they waited, trapped, for emergency personnel to extricate them. The accident was so severe that New Orleans police officers arriving at the scene requested that a member of their fatality investigation unit be dispatched. The officers feared that Mr. Meader would not survive.
Both plaintiffs were hospitalized with serious injuries. Officer Bruce Bono, fatality investigator, filed a 25 page report in which he established the fact that a stop sign was missing from the corner of Delery Street at its intersection with St. Claude Avenue. In addition, he concluded the ambulance driver was at fault for failing to see the Meader vehicle and for operating the ambulance in a careless manner.
On May 18, 1988, plaintiffs filed the instant suit against Joanne Williams, Jon Uzee, the City of New Orleans and State Farm Mutual Automobile Insurance Company. On January 9, 1990, plaintiffs amended their petition adding as defendant the State of Louisiana through the Department of Transportation and Development (DOTD).
On February 16, 1990, DOTD filed an answer and cross claim against defendants, the City of New Orleans, Joanne Williams and Jon Uzee asserting plaintiffs' injuries occurred solely and exclusively through the negligence and fault of Robert Meader, a third party, an act of God, and/or through the comparative fault of Robert Meader, and/or the several defendants.
Subsequently, the Maeders settled with all of the defendants leaving DOTD as the sole remaining defendant. On December 13, 1993 a bench trial commenced against DOTD.
On December 22, 1993 judgment was rendered in favor of plaintiffs. General damages were fixed at $240,202.82 for Robert Meader and $51,615.18 for Donna Meader. Expert fees were fixed at $275.00 for each of the two expert witnesses and taxed as costs to the DOTD. The trial court assigned 67% fault to the City, through the negligence of its ambulance driver, and 33% fault to DOTD.
From this judgment DOTD appeals asserting the following assignments of error:

*1008 1) The trial court committed manifest error by holding DOTD liable in solido with the City of New Orleans;
2) The trial court committed manifest error by failing to recognize the duty of the City to warn motorists of the danger created by the missing stop sign;
3) The trial court committed manifest error by attributing zero fault to the City for failing to report or replace stop signs it put in place and actually knew were missing.
Plaintiffs' answer the appeal asserting:
4) That the trial court erred when it assigned only 33% fault to DOTD and;
5) That the trial court erred in the award of general damage to plaintiffs.
The various arguments asserted with respect to liability raise the central issue of whether the trial court was clearly wrong in its assessment of fault. Those legal arguments asserted by both DOTD and plaintiffs are necessarily predicated on certain factual findings or conclusions. Thus, before addressing the arguments, we review the record evidence.

TESTIMONY ADDUCED AT TRIAL:

MARGARET GALLATY:
Margaret Gallaty testified that on the morning of the accident she was driving to work. As she was proceeding down St. Claude Avenue, she was approximately one to one and one half car lengths behind the Meader vehicle. The weather conditions were poor as it was very, very foggy. As the Meader vehicle approached the intersection of St. Claude Avenue and Delery Street, Gallaty saw an ambulance enter St. Claude Avenue from Delery and strike the Meader vehicle broadside. The Maeder vehicle was traveling in the left lane. The force of the impact pushed the Meader vehicle onto the median and into a light pole. Gallaty described the accident as quick, with no hesitation. She stated that there was nothing that Mr. Maeder could have done to avoid the accident. She testified that the ambulance was using its flashing lights but that she heard no siren.
Gallaty stated that she was very familiar with the intersection. She testified there was no stop sign at the intersection. She estimated it took approximately six months after the accident before a new stop sign was installed.

GLENN BALLON:
Glenn Ballon testified that he owns a uniform business located on the corner of St. Claude Avenue and Delery Street. Ballon stated that prior to the accident, the stop sign had been missing for approximately three to five months. He testified that the sign pole was not properly installed into the concrete thus allowing it to be easily removed by kids waiting for the bus. He often placed it back in its upright position only to have the kids remove it again. He testified he reported the problem to several police officers but no action was ever taken. When he telephoned the City to request they fix the problem, they responded that they had nothing to do with it. It was only after the accident happened that the sign was properly imbedded into the concrete.

ROBERT MAEDER:
Robert Maeder testified that on the day of the accident, he and his wife were driving down St. Claude Avenue on their way to work. He stated he was traveling between twenty and twenty-three miles per hour. The weather was very foggy. He testified he never saw the ambulance enter from Delery Street. The last thing he remembers was stopping for a traffic signal at St. Bernard Highway and Friscoville Street which was approximately five blocks from the accident scene. The next thing he remembers was regaining consciousness and being trapped inside his wrecked van. He stated he was jammed between the driver's seat and the roof. He had excruciating pain in his left side and felt blood dripping into his eye.
When he was discharged from the hospital he was wearing a cast from his left wrist to his left shoulder. He was unable to care for himself. He had to sleep on the couch for several months so that he could prop the cast against the back of the couch. He stated he missed approximately eleven weeks of work.
He testified that he underwent physical therapy until November, at which time the wire was removed from his shoulder. He *1009 stated the therapy was painful because it consisted of lifting weights. He testified that whenever he engaged in activity requiring him to lift his hands above his head he experienced pain. He also sustained a lot of pain when using his computer at work. Maeder testified that he has been advised that additional surgery could alleviate some of the pain. He stated that he has rejected surgery at the time of trial because of fear and also because he has adapted to his condition and has been able to work with it. He testified that he will opt for surgery only in the event that his condition becomes too painful to work. He admitted that he has not requested the Veterans Administration Medical Center to transfer him to a non-computer related job because he likes his job and can work with the pain at its current level.

DONNA MAEDER:
Donna Maeder testified that on the morning of the accident, she and her husband were enroute to work in the family van. She was seated in the front passenger seat. The weather conditions were extremely foggy. As she turned to look out of her window she saw the ambulance "looming" down on them before the impact.
She testified that she was not rendered unconscious following the impact. She called to her husband, but he did not respond. She testified that she thought her husband was dead because he looked like a "pile of rags" thrown into the corner. She observed blood trickling down his face. Both were trapped in the vehicle. She stated it took emergency crews between thirty to forty five minutes to remove them from the wreckage. Approximately five minutes after impact, her husband began to move and groan. His speech was incoherent. She testified she sustained bruises across her chest, blood in her urine and pain in her shoulders and neck. In addition, she had bruised ribs and pain in her foot.
Mrs. Maeder stated she was out of full time work for six weeks. She didn't resume permanent full time work until mid to late July, 1988. She was prescribed physical therapy but continued to have pain in her neck and across her left shoulder. She was then referred to an orthopedic surgeon, Dr. Walter Brent. She underwent an MRI which revealed a bulging disc. Dr. Brent prescribed ultrasound therapy and traction which provided some relief. When she was discharged in July, 1989, she had basically recovered.
Mrs. Maeder testified that her husband's memory loss was attributed to a concussion. He was unable to care for himself after he was discharged from the hospital. He was constantly in pain and took anti-inflammatory medication and pain medication as well as sleeping pills. She testified that sexual activity between them was not possible for months and is still restricted because of weakness in her husband's left side.

JOANNE WILLIAMS:
Joanne Williams testified that she was driving the ambulance the day of the accident. She testified that her route began at 1700 Moss Street, continued to Esplanade Avenue down Claiborne Avenue to Delery Street to St. Claude Avenue. She stated that she was using a stop and go technique at each intersection along Delery Street. The ambulance crew was responding to a call of a stabbing of an R.T.A. bus driver. This is a Code 2 call which requires lights, siren and obedience to all traffic laws. Williams explained that this requirement mandates that the ambulance driver stop, wait for traffic to yield and then to proceed safely across an intersection. Williams testified that she knew the intersection with St. Claude Avenue was ahead but did not realize she had entered into St. Claude prior to the accident. She testified that the weather was "very, very, thick fog". She stated that if she had seen a stop sign she would have stopped. As a result of the accident, Williams stated she was disciplined and suspended from driving. She also admitted that this was not her first accident.

JON UZEE:[1]
Jon Uzee testified that he is employed as a paramedic with the New Orleans Department *1010 of Health. He stated that on the day of the accident, Joanne Williams told him that the ambulance had received a dispatch that an R.T.A. bus driver had been assaulted. The dispatch Code was 2. He testified that as Joanne Williams began her egress into St. Claude Avenue at Delery Street, he noticed through the fog the St. Claude Avenue street sign. Just as he shouted to Williams that it was St. Claude Avenue, the ambulance struck the Meader vehicle. He stated "I had intended to warn her that we were not in a small intersection and what was missingI mean I didn't see a stop sign and I had assumed that when we would reach St. Claude we would see a stop sign." He stated there were no stop signs or traffic signals on Delery between Claiborne and St. Claude Avenues. Williams was using a stop and go technique at each intersection. She did not come to a complete stop at St. Claude but used the same technique. He described a Code 2 dispatch as one that allows the ambulance to proceed through intersections in contravention of the traffic laws as long as it is safe. The siren was in operation at the time. He testified that he was not aware, prior to the accident, that there was a stop sign at St. Claude Avenue and Delery Street. Because of the heavy fog he could not differentiate that intersection from the others they had driven through. He assumed it would be differentiated by the presence of a stop sign because St. Claude was a major street.

BRUCE BONO:
New Orleans Police Sergeant Bruce Bono, an accident fatality investigator, testified that he completed the accident report. He stated he was called to the scene because of the fear that Mr. Meader would not survive his injuries. When Bono arrived on the scene, he observed the ambulance was westbound on St. Claude Avenue and the Maeder vehicle was northbound on the median at the intersection on Delery Street. The Maeder vehicle had been struck broadside. He observed no stop sign at the intersection. The report indicated that the ambulance driver stated she did not come to a complete stop but was using a stop and go maneuver. Bono concluded Mr. Maeder could not have avoided the accident. Because of the dense fog, Bono testified the ambulance driver should have come to a complete stop. However, he opined that given the weather conditions, the ambulance driver may not have seen a stop sign.

ANTHONY RAINES:
Anthony Raines testified that he has been employed as a traffic engineer II for the City of New Orleans. Pursuant to a subpoena Raines brought several documents relating to the City's contractual obligation to maintain, repair and replace stop signs located on state highways. Raines stated that St. Claude Avenue is that part of Louisiana Highway 46 that runs through New Orleans. Raines referred to a letter dated February 12, 1986 from Verdi Adam, the chief maintenance and operations officer for the State. The letter indicated an intent to cancel all maintenance activities by the city on traffic control devices on state highways except for the electric traffic signals called "semaphores." The cancellation of the contract between the city and the state was to become effective March 31, 1986. After that date, the state took responsibility to maintain all traffic control devices on its highways except for the semaphores. The semaphores would still be maintained by the city which would be reimbursed by the state pursuant to a new contract.
A second letter dated May 20, 1986 from Robert Graves of the Department of Transportation and Development confirmed the letter of February 12, 1986. Raines produced a third letter dated June 6, 1986 from Mayor Barthelemy acknowledging the Graves letter.
The contract between the city and the state for 1987 to 1988 shows that only the semaphores along St. Claude were maintained by the city. Prior to the termination of the contract to maintain all traffic control devices along state highways, maintenance records show the city performed maintenance on the stop sign in question on June 9, 1981, November 2, 1982 and May 4, 1984. The records also indicated that on August 26, 1988, six months after the accident, the city installed the sign at Delery and St. Claude. Raines stated that the installation was done gratuitously because the city was under no obligation to perform the work. On cross *1011 examination, Raines stated that city work crews are not instructed to repair signs on state highways but they may do so if they wish.

ROBERT ROTH:
Robert Roth, district maintenance engineer for the Department of Transportation, testified that St. Claude Avenue is part of the state highway system. Roth stated that since March 31, 1986, the state has assumed responsibility for maintaining all traffic signs along St. Claude Avenue. He confirmed the fact that the city is only reimbursed for maintenance performed on the semaphores. Roth testified that the Department of Transportation has no regular sign inventory system to regularly check the condition of signs along their highways. Work performed on specific signs is only reflected in daily work reports. These daily logs show no maintenance work was performed on the stop sign at Delery and St. Claude for the entire year prior to the accident.
On cross examination, Roth stated that there was a period of time after the modification of the maintenance contract with the City that the Department of Transportation required the city to maintain all signs if they were off the right of way of a state highway. He was unable, however, to remember exactly when and for how long the policy existed. The stop sign at Delery Street and St. Claude Avenue would be in that category.

FRANCIS WYBLE:
Francis Wyble, retired employee of the Department of Transportation and private consultant, investigated the accident scene. He stated he found three stop signs at intersections along St. Claude Avenue that were city signs. In addition, a check of state highway records showed no maintenance was performed by the state on the stop sign at Delery Street and St. Claude a year prior to the accident and several months after the accident.

DR. WALTER BRENT, JR.:
Dr. Walter Brent, Jr. was recognized as an expert in the field of orthopedic surgery. He treated both Robert and Donna Maeder following the accident. He first saw Mr. Maeder in the emergency room of Chalmette General Hospital. Mr. Maeder was taken to surgery where he underwent a closed reduction of the fracture of his left forearm. In addition, Dr. Brent stated Mr. Maeder sustained a dislocated left elbow and right thumb which were repositioned and casted. Seven days later, on March 14, 1988, Dr. Brent testified he performed another operation on Mr. Maeder's left shoulder which involved an open reduction and internal fixation. To reduce the acromioclavicular separation of the left shoulder, Dr. Brent wrapped an 18 gauge wire around Mr. Maeder's clavicle. Mr. Maeder was subsequently discharged with a splint on his right hand, a cast on his left arm and a sling for his left shoulder. Dr. Brent prescribed extensive physical therapy which did improve Mr. Maeder's condition.
Five months after the accident, Dr. Brent noted traumatic arthritis in the left shoulder and elbow on x-ray. All splints were removed. Two months later, Mr. Maeder underwent another surgical procedure to remove the wire from his shoulder. In December of 1989, Dr. Brent noted that Maeder was continuing to experience problems with his left wrist as a result of a deviation of the ulna (crooked arm) which placed additional stress on his wrist when he was using his computers.
Mr. Maeder ultimately developed ulnar nerve neuritis. Dr. Brent stated he recommended a surgical procedure to relocate the ulnar nerve described as a ulnar nerve transplant. Dr. Brent found Mr. Maeder's wrist problems to be related to the elbow dislocation which translates to the ligaments of the wrists stretching and injuring them. Dr. Brent also noted calcification and continued complaints of pain in Mr. Maeder's left shoulder or acromioclavicular joint. Dr. Brent suggested that Mr. Maeder undergo a resection of the distal end of the clavicle if the pain becomes unbearable. In addition, Dr. Brent testified that a nerve transplant procedure would also be performed to alleviate the irritation and degeneration in the elbow joint. Dr. Brent testified that Mr. Maeder has a 15 to 20 percent disability of the left arm and shoulder area and lacks a full range of motion. He opined that future surgery would *1012 be expected to decrease the pain but not the degree of disability.
Dr. Brent testified he first saw Mrs. Maeder following her hospitalization. She was initially referred to him because of continuing cervical pain. Dr. Brent stated he ordered an MRI scan of the cervical spine. The results revealed mild bulging of the discs at the C3, C4 and C5 levels which prolonged her recovery. He stated he treated her with injections, medication and cervical traction. He discharged Mrs. Maeder on July 12, 1989. He stated that he did not feel she had any continuing problems related to the accident as of the day of trial.

BOBBY ROBERTS:
Bobby Roberts, testified that he is a category A vocational evaluation specialist. He was recognized as an expert in the field of vocational evaluation.
Roberts testified that he evaluated Mr. Maeder on April 6, 1993 for five to six hours. One and one-half hours consisted of interview time. The remainder consisted of functional testing to determine Maeder's strength and work endurance with different pieces of equipment. He concluded that academically Maeder functions at or above high school level. He found his symptoms profile to be very mild and therefore concluded Maeder did not need psychiatric treatment. He showed a decreased ability to work with his left hand or with both hands in a bimanual fashion. He found a 25% reduction in Maeder's left hand. He also said Maeder complained of pain in the left elbow when gripping an object two to two and one half inches in diameter. Maeder's limitations were confined to his left upper body. Roberts recommended additional physical therapy and medical exams to determine if any further treatment could reduce Maeder's limitations and pain in his left shoulder and elbow. Roberts suggested possible retraining to a job using primarily his right side. He suggested that Maeder consider retraining as a computer assisted drafter. However, he admitted the training is long and costly and Maeder would have to work from seven to eight years before he could realize the $23,000.00 per year salary he was earning at the time of the accident.

BOB GISCLAIR:
Bob Gisclair, vocational rehabilitation counselor testified that he evaluated Robert Maeder. He found that Maeder is able to function at this job but that he does have difficulty. He recommended that Meader discuss job modification with the Veterans Administration Medical Center. He noted that Maeder displayed significant loss of grip strength in his left upper body and difficulty reaching above shoulder level.

APPELLATE REVIEW:
A court of appeal may not set aside a trial court's finding of fact in the absence of "manifest error" or unless it is "clearly wrong". Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. Esco d/b/a Jolly Elevator Corp., 549 So.2d 840 (La.1989).
When findings are based on a determination regarding the credibility of witnesses, the manifest error clearly wrong standard demands great deference to the trier of fact's findings; for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Lirette v. State Farm Insurance Company, 563 So.2d 850 (La.1990), citing, Rosell, supra. This rule applies to the evaluation of expert testimony as well, unless the stated reasons of the expert are patently unsound. Lirette, supra, citing Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La. 1990). The trier of fact may accept or reject any part of the witness' testimony. Johnson v. Manis, 437 So.2d 359 (La.App. 4th Cir. 1983), writ den. 441 So.2d 1222 (La.1983).

NEGLIGENCE:
Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it. La.C.C. Art. 2315. These acts include both acts of commission *1013 and omission if the duty imposed by the relationship of the parties is breached by such act or omission. La.C.C. art. 2316; Smith v. Travelers Ins. Co., 430 So.2d 55 (La.1983).
Generally, negligence is defined as conduct which falls below the standard established by law for the protection of others against an unreasonable risk of harm. Dobson v. Louisiana Power and Light Company, 567 So.2d 569 (La.1990). A particular unforeseeable risk may be included within the scope of a duty if the injury is easily associated with the rule relied on and with other risks of the same type that are foreseeable and clearly within the ambit of protection. Forest v. State, thru La. Dept. of Transportation, 493 So.2d 563 (La.1986).
In reviewing a determination that negligence exists, the reviewing court must consider the ease with which it can associate the duty owed and the risk encountered, whether the breached duty was a substantial cause and whether the risk is reasonably foreseeable. See, Sibley v. Gifford Hill and Co. Inc., 475 So.2d 315 (La.1985); Dunne v. Orleans Parish School Board, 463 So.2d 1267 (La.1985). Furthermore, whether a legal duty is owed by one party to another depends upon the facts and circumstances of the case and the relationship of the parties. Seals v. Morris, 410 So.2d 715 (La.1981).

ASSIGNMENT OF ERROR 1:
DOTD asserts the trial court erred by holding it liable in solido with the City of New Orleans. Specifically, DOTD argues that plaintiffs failed to establish that the missing stop sign was a cause-in-fact of the accident.
DOTD's argument relies heavily on the expert testimony of Sergeant Bruce Bono who testified that his investigation revealed that the cause of the accident was Joanne Williams' inattention and negligent operation of the ambulance and not the absence of the stop sign. As a concomitant of this argument, DOTD asserts that the issue of constructive notice is irrelevant because the plaintiffs failed to carry their burden of proof as to causation and failed to establish the stop sign had been missing under circumstances such that the State should have been aware of the problem. See, Alexander v. Rivers, 560 So.2d 999 (La.App. 4th Cir.1990); Boudoin v. City of Kenner, 556 So.2d 123 (La.App. 5th Cir.1990).
In his reasons for judgment the trial court stated:
"Mrs. Williams testified she would have brought her vehicle to a complete stop had there been a stop sign.
* * * * * * ... In terms of time, the stop sign had been missing for quite a while, maybe three (3), four (4) or five (5) months. R.S. 9:2800(C) recognizes the doctrine of constructive notice. The DOTD did not have actual notice. The evidence established constructive notice. In the court's opinion the stop sign in question was missing for an inordinate period of time nor was it replaced prior to the accident.
The jurisprudence placed upon the plaintiff the burden of proving that a missing stop sign had been down for a length of time and that the ... state entity should have been aware of the problem through due diligence."
The court is of the opinion the plaintiffs have carried their burden of proof in this respect by a preponderance of the evidence as well as the existence of a trap created by the missing stop sign, which was a proximate cause of the accident."
DOTD argues that the threshold requirement of the missing stop sign constituting a "trap" is absent in this case, and therefore it should bear no responsibility, citing Ponthier v. City of New Orleans, 496 So.2d 1050 (La. App. 4th Cir.1986), writ denied 498 So.2d 15 (La.1986). In actuality, the Ponthier court's reference to a "trap" is merely another means of conveying the cause-in-fact message. That is, if the missing sign deludes the motorist into believing he has the right of way or that it is safe to proceed, then it is a cause-in-fact of the accident, i.e. a trap. In those instances, the missing sign can easily be associated with the harm sustained by the injured party. If the missing sign would have made no difference in the offending *1014 motorist's actions, then no "trap" is created and there is no cause-in-fact.
The trial court's reasons for judgment clearly indicate that the Court chose not to rely solely on the testimony of Sergeant Bono as to the cause-in-fact of the accident. The record does not support Bono's opinion that the accident would have occurred even if the stop sign were present.
Joanne Williams testified that she was using a "stop and go" technique at numerous uncontrolled intersections along Delery Street. She stated that had there been a stop sign at St. Claude and Delery that she would have stopped her vehicle. Likewise, the testimony of Jon Uzee establishes that he was expecting a stop sign at St. Claude to differentiate it from the other uncontrolled intersections. Uzee stated, "I could see no difference in the intersection initially then the several others we had traveled through... I had assumed that when we would reach St. Claude we would see a stop sign." Thus, we are satisfied that whether we speak of "trap" or cause-in-fact, the record supports the trial court's conclusion that the missing sign was a contributing cause of the accident. We now discuss DOTD's responsibility to maintain the sign.

DOTD'S DUTY:
St. Claude Avenue is part of the state highway system, designated as La. Hwy. No. 46. Thus DOTD is responsible for the maintenance and control of traffic signals on St. Claude Avenue. See, La.R.S. 48:193. This duty includes the signing at intersections along the highway. Rick v. State, Through DOTD, 619 So.2d 1149 (La.App. 1st Cir.1993), aff'd in pat, rev'd in part 630 So.2d 1271 (La.1994). It is also well established that DOTD's duty is non-delegable and cannot be contracted away to another entity. Smith v. Zimmer, 553 So.2d 919 (La.App. 4th Cir.1989); Guillotte v. Dept. of Transportation and Development, 503 So.2d 618 (La. App. 4th Cir.1987).
By failing to properly maintain the stop sign at the intersection of St. Claude Avenue and Delery Street DOTD breached the duty imposed on it by law. And, the duty breached encompassed the ambit of protection owed to the Maeders.
DOTD argues, however, that plaintiffs failed to prove that it had notice, either actual or constructive, of the missing sign, citing La.R.S. 9:2800. DOTD's legal argument is correct. Before liability can be imposed, DOTD must have knowledge of the missing sign and an opportunity to remedy the situation. See, Alexander v. Rivers, supra. Factually, however, the trial court concluded otherwise. The court found that DOTD had constructive knowledge. The record supports this finding.
The testimony of Glenn Ballon apparently impressed the trial judge. He testified extensively about how the sign would be knocked down, and that it had been missing for as long as five months. In addition, Francis Wyble, private consultant and retired DOTD employee, testified that state highway department records revealed that no maintenance had been performed on this stop sign for up to a year prior to the accident. Robert Roth, DOTD district maintenance engineer, testified that DOTD had no regular sign inventory nor maintenance system to inspect the condition of traffic control signs along state highways.
It is reasonable to conclude that the State showed little due diligence in carrying out its duty to the public. DOTD's argument about lack of notice is really an attack on Ballon's testimony, which we have already noted impressed the trial judge. Wyble and Roth's testimony do very little to bolster DOTD's argument.
This assignment of error lacks merit.

ASSIGNMENT OF ERROR 2, 3 AND 4:
The DOTD argues that the evidence establishes that the city had a "practice of replacing and repairing stop signs on State, DOTD routes." As such, the city undertook the duty of the State for the signing of the intersection and the warning of motorists of any existing hazards. This action by the city gives rise to a State claim for indemnification against the city. We disagree.
In Guillotte v. Dept. of Transportation and Development, supra, this Court held Plaquemines Parish a co-tortfeasor with the State for failing to repair the defective shoulder of *1015 Louisiana Highway 23 which caused plaintiff's injuries. In so finding we stated:
"The State has primary responsibility for the maintenance of state highways, including shoulders. (citations omitted) ...
* * * * * *

Although the Parish initially may not have had a duty to the plaintiff to maintain the highway, that duty belonging primarily to the State, it undertook the responsibility of maintaining the shoulder, and, therefore, acquired the duty to maintain the shoulder properly. (citations omitted). Because its negligent failure to properly maintain the shoulder was a legal cause of this accident, the Parish is a cotortfeasor with the State." (emphasis added) Id. at 620, 621.
Although the Court does not address in detail the type and/or frequency of maintenance activity undertaken by Plaquemines Parish, we must assume that it was often and substantial enough to have rendered the Parish liable when it initially had no duty to the plaintiff.
The evidence in the instant case does not establish any substantial and/or frequent activity by the City following termination of the contract in March of 1986 that would render it liable to plaintiffs to maintain the stop sign in question. To the contrary, the City's sign file listings showed the City performed maintenance on the sign on five occasions between 1975 and 1984, while the contract was in effect, and only once in 1988, several months after the accident and almost two years following termination of the contract. In addition, the testimony of Anthony Raines, traffic engineer for the City established that the sign maintenance crews did not have authorization to undertake any regular or routine maintenance on signs along state highways. If on occasion they repaired or replaced a sign while working near a state highway it would have been at their option and purely gratuitous in nature.
We find no error in the trial court's finding that DOTD was solely responsible for the maintenance and repair of the stop sign.

ALLOCATION OF FAULT:
Plaintiffs assert the trial court erred in only allocating 33% fault to DOTD. They request it be increased to 75%.
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including:
(1) whether the conduct resulted from inadvertence;
(2) how great a risk was created by the conduct;
(3) the significance of what was sought by the conduct;
(4) the capacities of the actor, whether superior or inferior, and;
(5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought.
Watson v. State Farm Fire and Casualty Ins. Co., 469 So.2d 967 (La.1985).
In addition, concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to plaintiff are also considerations. Watson, supra.
The allocation of fault is a matter entirely factual subject to reasonable evaluations of credibility and reasonable inferences of fact pursuant to the clearly wrong standard. Lee v. Missouri Pacific Railroad Co., 540 So.2d 287 (La.1989). Applying the standard enunciated in Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), the appropriate question for appellate review is whether the trial court's allocation of fault are clearly wrong or manifestly erroneous.
A consideration of the above factors does not lead to the conclusion that the trial court's allocation of fault is clearly wrong in this case. The majority of the fault must be with the City vicariously through the actions of an employee. The causal relation between the ambulance driver's conduct and the accident is a direct one. DOTD's negligence was not directly related. Joanne Williams, not the DOTD, had complete and sole control of the operation of her vehicle. An ambulance hurriedly responding to an emergency call creates a greater risk of harm to the motoring public requiring a greater degree of care *1016 in its operation, especially in poor weather conditions such as existed on the morning of the accident. Visibility was extremely poor. Williams testified that a code 2 dispatch requires lights, siren and obedience of all traffic laws requiring that she stop and wait for oncoming traffic to yield before proceeding across an intersection. She stated she had crossed several uncontrolled intersections using a "stop and go" technique. Being familiar with the area, she was aware that St. Claude Avenue, a major right of way, was ahead of her as she proceeded down Delery Street. As such, she should have proceeded with greater caution. Her failure to do so was the primary cause of the accident.
In addition, as previously discussed, it was not clearly wrong for the trial court to find a lesser percentage of fault on DOTD. Based on the evidence, it is a reasonable to conclude that the missing stop sign was a contributing cause of the accident, although to a lesser degree.

ASSIGNMENT OF ERROR 5:
Plaintiffs assert the trial court erred in assessing the amount of general damages, specifically regarding loss of earning capacity.
Before a damage award may be set aside as inadequate or excessive, the reviewing court must look first, not to prior awards, but to individual circumstances of the instant matter before it. Only after an analysis of the facts and circumstances peculiar to the instant case can a reviewing court determine if the award is either excessive or inadequate. The reviewing court may not merely look at past awards for similar injuries in the determination of whether the trier of fact abused its much discretion. Reck v. Stevens, 373 So.2d 498 (La.1979); Page v. Gilbert, 598 So.2d 1110 (La.App. 4th Cir. 1992).
In his reasons for judgment, the trial court stated:
"Counsel stipulated Mr. Maeder's past medical bills are $26,704.32 and past lost wages are $5,398.50. The cost of future surgery is $13,100.00.
* * * * * *
Counsel stipulated Mrs. Maeder's medical bills total $16,255.95 and lost wages of $9,359.23.
* * * * * *
The Court will award general damages to Mr. Robert L. Maeder in the sum $240,202.82, which figure includes his stipulated damages.
The Court will award Mrs. Donna S. Maeder general damages in the sum of $51,615.18, which damages include her stipulated special damages.
The plaintiff also sought damages for vocational retraining and produced a witness that suggested Mr. Maeder be retrained because it was inconceivable that Mr. Maeder would continue in this current job while experiencing pain. However, Mr. Maeder testified that he does not want to change jobs and has refused surgery which would relieve his pain. Therefore, the plaintiff will be denied damages for retraining. Corrective surgery is available to him which would alleviate his pain and allows him to remain in his current position."
Also included in the trial court's reasons for judgment was a detailed description of plaintiffs' injuries and residual disability of Mr. Maeder, indicating that the trial court was well aware of the nature and severity of those injuries when assessing damages.
The total amount of Mr. Maeder's stipulated damages, $45,202.82 subtracted from his total of $240,202.82 results in a general damage award of $195,000.00.
The total amount of Mrs. Maeder's stipulated damages, $25,615.18 subtracted from her total award of $51,615.18 results in a general damage award of $26,000.00
At trial, Mr. Maeder testified that he had adapted to his condition and was able to work at his regular job. He stated that he will only opt for surgery in the event his condition becomes too painful. He admitted that he did not request his employer to transfer him to a non-computer related job because he likes his regular job and is able to work with the pain at its current level.
*1017 Mrs. Maeder testified that as a result of her injuries, she was unable to work full time for six weeks and resumed permanent full time employment in late July, 1988, approximately four months after the accident. When she was discharged in July, 1989, she had basically recovered. Thus, we find no error in the trial court's award of general damages.
For the foregoing reasons, the judgment of the trial court is affirmed. All costs of this appeal to be paid by appellant.
AFFIRMED.
NOTES
[1] The testimony of Jon Uzee was introduced into evidence via his sworn deposition of September 29, 1988.