615 So.2d 289 (1993)
Audrey D. FAUCHEAUX, Individually and as Administratrix of the Succession of Clay J. Faucheaux, and for and in Behalf of her Children, Clay A., Eric J. and Neal J. Faucheaux
v.
TERREBONNE CONSOLIDATED GOVERNMENT, et al.
No. 92-C-0930.
Supreme Court of Louisiana.
February 22, 1993.
Rehearing Denied March 25, 1993.
*290 Eldon E. Fallon, Elizabeth Rue Bridgeman, Gainsburgh, Benjamin, Fallon, David & Ates, New Orleans, Johnny X. Allemand, Thibodaux, for applicant.
Robert A. Chaisson, Chaisson & Chaisson, Destrehan, C. Berwick Duval, II, Duval, Funderburk, Sundbery & Lovell, Houma, for respondents.
HALL, Justice.[*]
Clay J. Faucheaux died of a heart attack as a result of physical and mental stress he experienced when the fishing boat he was operating in a canal was struck by a descending gate which blocked the canal. His wife and children brought suit for survival and wrongful death damages against the Terrebonne Parish Consolidated Government and Terrebonne Parish Water District No. 1 (hereafter collectively called Terrebonne *291 Parish), owner and operator of the gate. After trial, judgment was rendered in favor of the defendants, dismissing plaintiffs' suit. The judgment was affirmed on appeal. Faucheaux v. Terrebonne Consol. Gov., 597 So.2d 503 (La. App. 1st Cir.1992). We granted writs, 599 So.2d 305 (La.1992), and now reverse.
The facts are accurately set forth in the court of appeal opinion:
"On September 14, 1985, at about 5:10 a.m. Clay J. Faucheaux picked up his nephew, Bernard Faucheaux at Nicholls State University in Thibodeaux where he was a student, to go on a fresh water fishing trip. They drove to Cannon's Landing, where at about 5:45 a.m. just as daylight was breaking, they launched Clay J. Faucheaux's 16½ foot bass boat. Clay Faucheaux was at the controls which were located at the approximate center of the boat. Bernard was seated in the rear. They left the launch, turned right and proceeded on Black Bayou for 400 or 500 hundred yards to the highway 90 bridge where they turned left under the bridge into Minor's Canal. They were travelling at idle speed estimated to be about 5 knots. Located 400 feet down Minor's Canal from the bridge there is a levee structure which closes off the entire canal except for an opening measuring approximately 8×8. This opening can be closed by what is termed a Tainter gate. When closed this gate prevents salt water from intruding through Minor's Canal. The gate, which is a solid metal structure, is opened and closed by being raised and lowered by an electric motor. The gate has three positions; locked open which means the gate is up, locked closed which means the gate is down in the water and can be opened only by T.P. personnel, and `on the button' which means the gate is down but can be opened by pressing a button which is located on the bottom of the levee to the right when approaching from the Highway 90 bridge. The button can be pressed from a boat. When pressed the gate opens and remains open for 1½ minutes when it automatically closes again. It closes very slowly at 1.1 inches per second.
"Bernard Faucheaux had never been through the gate prior to that morning with his uncle. He saw the structure when the boat turned into Minor's Canal at the bridge. He noted another boat going through. He then proceeded to arrange his fishing equipment and without looking further. He did not look back up until he heard his uncle exclaim, `That sucker's coming down!' He then looked up and saw the boat already in the passageway where the gate was located. At that time the gate was about 4 to 6 inches above the front of the boat, coming down. His uncle left his position, went to the front of the boat and tried to push it back from the gate by pushing against the side of the levee. Bernard followed suit. When that effort did not accomplish its purpose they decided to exit the boat. They did so by going to the back and getting out on the levee on the left side.
"After they exited the boat the gate kept descending, pushing it under. Their equipment was floating on the water. His uncle asked for directions to the button from people in another boat. He then proceeded up the levee to a bridge which crossed the opening containing the gate. He crossed the bridge, walked down the levee on the other side and pressed the button. He then collapsed and died.
"Clay J. Faucheaux had a history of heart trouble including a prior heart attack. The undisputed cause of death was ventricular fibrillation brought on by the excitement and stress of the incident with the gate." Id., at 505.
The evidence also established that there were no horns, whistles, colored lights or other warnings to indicate that the gate was descending. There was one white light near the top of the structure designed to come on when the gate is closing. Further, there was no warning to indicate whether the gate was in the locked open position or "on the button." The gate was kept in the locked open position at least ninety percent of the time. There was *292 evidence that Clay Faucheaux had fished in this area before, but there was no evidence to show whether he was familiar with the manner in which the gate operated or whether he had ever seen the gate in the down or "on the button" position.
Throughout this litigation, plaintiffs have sought to recover on the basis of the parish's negligence in failing to provide adequate warnings when the gate was descending. The trial court found that Mr. Faucheaux should have seen the descending gate and that the accident was solely his fault in not keeping a proper lookout. The court of appeal correctly found that the parish's duty in regard to traffic on the canal was similar to that of a governing authority with jurisdiction over a street or highway. There is a duty to provide warnings sufficient to warn travelers of any unusual obstacles, perilous conditions or defects that entail danger to the physical safety of those proceeding on such routes. The court of appeal also found, erroneously as applied to this case, that in order for the parish to have a duty to provide warnings, the parish must have knowledge of the existence of a dangerous condition, and that the evidence in this case did not establish such knowledge.
A duty-risk analysis is helpful in resolving a negligence case such as this. In making the requisite analysis, four questions are to be considered:
(1) Was the conduct in question a cause-in-fact of the resulting harm?
(2) What, if any, duties were owed by the respective parties?
(3) Were the requisite duties breached?
(4) Was the risk and harm caused within the scope of protection afforded by the duty breached?
Mart v. Hill, 505 So.2d 1120 (La. 1987). For plaintiff to recover on a negligence theory, all four inquiries must be affirmatively answered.

CAUSE-IN-FACT
Cause-in-fact is generally a "but for" inquiry; if the plaintiff probably would not have sustained the injuries but for the defendant's substandard conduct, such conduct, is a cause-in-fact. Fowler v. Roberts, 556 So.2d 1, 5 (La.1989). To the extent that the defendant's actions had something to do with the injury the plaintiff sustained, the test of a factual, causal relationship is met. Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620, 622 (1972).
It is clear that the parish's failure to provide adequate warningsblinking red lights or blast of a horn, or even a large signwas a cause-in-fact of the accident and resulting death of Mr. Faucheaux. The accident would not have happened but for the failure to warn. The presumption is that the boat operator would have heeded such a warning; the operator's attention would have been called to the hazard, the closing gate.
The medical evidence is clear that the stress of the incident, particularly the mental or emotional stress, precipitated the heart attack, ventricular fibrillation. Although decedent was in a high risk category, according to the medical testimony he would not have died that day, at that time and place, except for the incident.
Thus, the defendant's conduct complained of was the cause-in-fact of the accident and resulting heart attack.

DUTY
Duty is a question of law. Simply put, the inquiry is whether the plaintiff has any lawstatutory, jurisprudential, or arising from general principles of faultto support his claim. Green, The Causal Relation Issue and Negligence Law, 60 Mich. L.Rev. 543, 562-63 (1962).
Plaintiffs urge that the parish was under a duty to provide blinking lights and horn blasts pursuant to Coast Guard regulations dealing with obstruction to navigation. Plaintiffs assert that failure to comply with these regulations was "negligence per se." The terminology "negligence per se" has been rejected in Louisiana. See Weber v. Phoenix Assurance Company of New York, 273 So.2d 30 (La. 1973). The violation of a statute or regulation does not automatically, in and of itself, impose civil liability. Civil responsibility is imposed *293 only if the act in violation of the statute is the legal cause of damage to another.
In any event, the court of appeal correctly found that plaintiffs failed to establish that a Corps of Engineers permit was required or that the Coast Guard regulations were applicable to this gate on this waterway. Nevertheless, the testimony by plaintiffs' expert in marine safety that this gate constituted an obstruction to navigation and should have had proper markings and warning devices such as horns and blinking lights to indicate when the gate was closing, is significant evidence on the issue of the defendant's duty under general negligence or fault principles. Regardless of whether the waterway was considered navigable for Corps of Engineer or Coast Guard purposes, the canal was used extensively by boat traffic, and the gate, when closed or closing, certainly represented an obstruction to the safe navigation of the canal by boat operators.
The court of appeal correctly analogized the duty of the parish in maintaining the gate on the well-traveled canal as being similar to the duty of a governmental authority in maintaining streets and highways. The parish had the duty to provide adequate signing, marking and warnings to alert boat operators traveling on the canal to unusual, perilous and unexpected hazards. Forest v. State Through Louisiana Department of Transportation, 493 So.2d 563 (La. 1986). The court of appeal erroneously determined, however, that the parish had no duty to provide warnings in this instance because it was not proved that the parish had knowledge of any danger presented by the gate and its manner of operation. Cited as authority were cases where defects developed after construction of the facility, such as where a sign had been removed or where a defect developed over a period of time. These cases and their requirement of knowledge are not applicable where the need to provide warnings arises from a danger inherent in the design and construction of the facility. A public body charged with maintaining a public route cannot claim lack of knowledge of the need to provide warnings where the danger is obvious and inherent in the design and construction of the facility. A public body is held to know of the danger of an unmarked intersection, or a sharp curve, or a draw bridge, or, as in this case, a gate that raises and lowers automatically so as to block a canal used by boat operators. Likewise, the public authority must provide adequate warnings of unusual obstructions or perilous conditions so as to make the route reasonably safe for those traveling on it.
Although only two prior accidents were established by the evidence, the danger presented by the gate, particularly in the dark or semi-darkness, is apparent and is amply demonstrated by the video tape in evidence. Certainly the gate can be seen descending by a boat operator keeping a proper lookout, but presents a danger to one who is unfamiliar with the operation of the gate or who is inattentive or distracted. The governmental authority owes a duty to an inattentive traveler as well as to an attentive one. Molbert v. Toepfer, 550 So.2d 183 (La.1989).
As constructed and operated, the gate, absent warnings, presented an unreasonable risk of injury to persons operating boats on the canal, particularly those who were not familiar with the manner of operation of the gate. A person who did not know that the gate automatically lowered while "on the button," would have no reason to direct special attention to the passageway or to anticipate that the gate would lower in the face of oncoming boat traffic. The need for warning devices and the duty of the parish to provide them is apparent.

BREACH OF DUTY
This question in the duty-risk analysis is easily answered. The parish failed to install warning devices and thereby breached its duty to those operating boats on the canal.

SCOPE OF DUTY
The scope of the duty inquiry is ultimately a question of policy as to whether the particular risk falls within the scope of the duty. Rules of conduct are designed *294 to protect some persons under some circumstances against some risks. Gresham v. Davenport, 537 So.2d 1144, 1147 (La. 1989); Malone, Ruminations on Cause-in-Fact, 9 Stan.L.Rev. 60, 73 (1956). The scope of protection inquiry asks whether the enunciated rule extends to or is intended to protect this plaintiff from this type of harm arising in this manner. Crowe, The Anatomy of a Tort-Greenian, As Interpreted by Crowe Who Has Been Influenced by MaloneA Primer, 22 Loy. L.Rev. 903 (1976). In determining the limitation to be placed on liability for defendant's substandard conduct, the proper inquiry is often how easily the risk of injury to plaintiff can be associated with the duty sought to be enforced. Hill, supra.
The duty to warn of the danger presented by the descending gate weighing several thousand pounds clearly encompassed the risk that a boat might collide with or be caught by the descending gate and that property damage and personal injury might result from the collision. The duty imposed is designed to prevent a collision between a boat operator and the gate and any injuries resulting therefrom.
Defendant argues that the decedent's heart attack was an unforeseeable event and therefore not within the scope of its duty, citing Todd v. Aetna Casualty and Surety Company, 219 So.2d 538 (La.App. 3d Cir. 1969), writ denied, 254 La. 13, 222 So.2d 66 (1969). In Todd, the court found that the defendant's duty not to collide with a parked car did not encompass the risk that the owner of the car, who was not in the car at the time of the collision, would later experience a fatal heart attack. Todd can be distinguished from the present case by the fact that Mr. Faucheaux was in the boat when the accident occurred, was himself placed in a potentially perilous situation, and the heart attack occurred during ongoing immediate efforts to extricate the boat from the perilous situation.
The accident and resulting injury to the decedent is easily associated with the duty to warn of the descending gate and falls within the scope of that duty.
All four duty-risk questions being answered in the affirmative, it follows that defendant is liable to the plaintiff for its negligence which resulted in the death of Mr. Faucheaux.

COMPARATIVE NEGLIGENCE
Because the trial and appellate courts found Terrebonne Parish owed no duty to warn, they never reached the question of apportionment of fault between defendant and the decedent under LSA-C.C. Art. 2323.
As discussed above, defendant breached a duty owed to Faucheaux, resulting in his death. Mr. Faucheaux's inattentiveness while steering his boat was also a major cause of the accident. Because both parties were at fault, fault must be apportioned between the two parties. In assessing the negligent conduct of the two parties, various factors may influence the degree of fault assigned to each:
"(1) Whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) How great a risk was created by the conduct, (3) The significance of what was sought by the conduct, (4) The capacities of the actor, whether superior or inferior, and (5) Any extenuating circumstances which might require the actor to proceed in haste, without proper thought." Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967, 974 (La.1985).
Mr. Faucheaux's negligence arose from his inadvertence. At an estimated speed of five knots per hour, it would have taken Faucheaux 48 seconds to travel from the Highway 90 bridge to the opening of the gate. He was about 292 feet from the gate when it began to close. This left him with about the length of a football field to notice the gate was closing and avoid a collision.
Had he been keeping a proper lookout, he would have seen the gate descending and could have taken steps to avoid colliding with the descending gate. However, Mr. Faucheaux's negligence in not seeing the lowering gate was not as great as it might seem at first blush. The gate stayed in the locked open position more than ninety percent of the time and it was not established *295 that Mr. Faucheaux was familiar with the fact that the gate would automatically close when in the "on the button" position. After seeing that the gate was open and watching a preceding boat go through the gate, Mr. Faucheaux, if he was not familiar with the automatic operation, could have assumed that the gate would remain open, and he would have no reason to keep a special lookout directed toward the gate.
On the other hand, the parish's negligence involved an awareness of the danger, a substantial risk was created by the failure to provide warnings when the gate was automatically descending, and the risk could have been easily and inexpensively avoided by the furnishing of warnings.
Considering the Watson factors, we apportion fault sixty percent to the parish and forty percent to Mr. Faucheaux.

DAMAGES
The issue of the amount of damages was not argued or briefed in this court. The case will be remanded to the court of appeal to make a determination of the amount of damages due.

DECREE
For the reasons assigned, the judgment of the district court, as affirmed by the court of appeal, is reversed, and judgment is hereby rendered in favor of the plaintiffs and against the defendants declaring that the defendants were negligent and are liable, and apportioning fault sixty percent to the defendants and forty percent to the decedent. The case is remanded to the Court of Appeal, First Circuit for a determination of the amount of damages.
REVERSED, RENDERED AND REMANDED.
NOTES
[*] Justice Luther Cole was assigned to participate in this case, having been on the Court when it was argued. For the procedure employed in cases argued after January 1, 1993, see the footnote in State v. Kip Barras, et al., 615 So.2d 285, decided on this date.