11 JOHN C. BOUTALL, Judge Pro. Tem.
Plaintiff, Jeannette S. Bookman (“Mrs. Bookman”), appeals a jury verdict and judgment of the district court in favor of defendants, C’s Discount Pharmacy (“C’s”) and Edward Skinner (“Skinner”). We affirm.

FACTS

Plaintiff/appellant, Mrs. Bookman, filed suit in the Twenty-Fourth Judicial District Court for damages which she alleged that she suffered due Uto the negligence of Skinner in incorrectly filling her prescriptions. In her petition she averred that she was being treated for depression by a psychiatrist, Dr. Glenn Ruffin, who had prescribed two medications: one a sleeping medication known as “Restoril” and the other an antidepressant known as “Prozac.” Mrs. Book-man had originally taken the prescriptions to C’s to be filled; during the period between July 1 and July 9, 1990 she had them refilled there.
The lawsuit alleges that upon refill, the prescriptions were erroneously switched in the bottles, so that the bottle labelled “Prozac” was actually Restoril, and vice-versa. The prescribed dosage was one Prozac pill in the morning and one — two Restoril for sleep in the evening.
According to plaintiff, during the week following July 9, 1990, when she took two of what she believed to be Restorils before bedtime, she was in fact taking two Prozac pills. Mrs. Bookman claims that as a result of the “overdose” of Prozac, she became increasingly disturbed and ultimately was hospitalized in a psychiatric facility for five weeks. She asked for damages in compensation for her pain and suffering, as well as for medical expenses, urging that but for the overdose of Prozac, her condition would not have deteriorated and the hospitalization would not have been necessitated. Mrs. Bookman sued Mr. Skinner, the pharmacist who refilled her prescriptions; C’s Discount Pharmacy; Felix and Steven Ciolino, owners of the pharmacy; and CIGNA Property and Casualty Companies, the insurer. |3Prior to trial, Felix and Steven Ciolino were dismissed as individual defendants.
A jury trial was held in February, 1994, following which the jury found that the remaining defendants, C’s Pharmacy and Skinner, were not negligent in refilling the prescriptions. Mrs. Bookman appeals.
On appeal, Mrs. Bookman does not assign specific errors, but rather states that the *984 issues are whether she proved by a preponderance of the evidence that the exchange of medications were a result of the negligence of the defendants and whether the jury verdict was manifestly erroneous.

EVIDENCE

At trial, Mrs. Bookman testified on direct examination that she had been treated by Dr. Ruffin for depression from 1969 through 1981; prior to 1969 she had undergone other psychiatric treatment for over twenty years. Mrs. Bookman lost her husband in 1987, and in March of 1990, at the age of seventy-three, she took a trip to Israel that she had originally planned to take with her husband. Three or four weeks after she returned, she again consulted Dr. Ruffin because of depression. Therapy initially did not include drugs, but on June 22, the physician gave her the prescriptions for Restoril and Prozac. She had the prescriptions filled at C’s on that date and while her mood did not improve, she began to sleep better. She had the prescriptions refilled on July 9, and then began to experience increasing agitation. She decided that Prozac was the cause and stopped taking it. She consulted Dr. Ruffin on her restlessness, but did not tell him of that decision. As the week continued, things got worse and Mrs. Bookman pcould not sleep at all. On Monday, July 16, she returned from an outing and, due to her agitation, began to tear up papers and books in her apartment, feeling out of control. She telephoned a friend who, upon seeing Mrs. Bookman and the apartment, telephoned Dr. Ruffin. Plaintiff was admitted to Coliseum House that night where she remained for five weeks. While in Coliseum House, Prozac was administered to her and, according to plaintiff, her problems got worse. After several weeks, Prozac was discontinued and plaintiff received electro-convulsive therapy-shock treatments. She improved and was released from the hospital in September.
Following her release, Mrs. Bookman’s daughter asked her mother for the remaining Prozac pills. According to plaintiff, her daughter called the next day and informed her that the Prozac bottle contained Restoril; later, Mrs. Bookman took the bottles to Dr. Ruffin who confirmed that the contents of the bottles were switched. Plaintiff denied having switched the medications. She also stated that since this incident, she has taken Prozac. Mrs. Bookman suffered from partial temporary memory loss due to the electroshock treatments.
On cross-examination, Mrs. Bookman stated that prior to the incident in question, she had been twice hospitalized for psychiatric reasons. In May of 1990, she was suffering a delayed reaction to the death of her husband; further, Mrs. Bookman had been depressed because of her daughter and granddaughter, who also suffer from the illness of depression. Finally, at that time plaintiff had two friends who had been diagnosed with cancer. I gShe stated that she began to take Prozac on the morning of June 23; on July 9 when the prescription was refilled, she still had three pills left. When she would get a refill, she always put the new bottle behind the old one until the original prescription was finished, and she always finished the original before beginning the refill. Before July 9, she was not agitated. She did not recall at trial that she had a refill on June 29, but did recall having been so informed by her attorney. She testified that she probably took one Res-toril every night at first, and if she slept, she would not take more. She did not remember when she started taking two every night. After the first refill of June 29, she probably had 12 Restoril from the first prescription and 20 from the second. She did not tell anyone, including Dr. Ruffin, that she felt the Prozac was causing her problems. Following her release from the hospital, when she brought her daughter the leftover Prozac, she stated that her daughter did not open the pills in her presence, but called her later that same day to tell her of the mix-up.
Judith Rudman, Mrs. Bookman’s daughter, testified that during the second week of July she noticed a tremendous change in her mother, who had become very agitated, calling her daughter several times a day to tell her that she couldn’t sleep, and to seek reassurance.
On the night she was admitted to the hospital, plaintiff called her daughter to ask for some clothes to be brought to her. Mrs. *985 Rudman found her mother’s apartment an uncharacteristic mess, with tom up books and papers. Plaintiff improved after the shock treatments and after the Prozac 16was discontinued. Mrs. Rudman stated that when her mother brought her the leftover Prozac, she opened the bottle in her mother’s presence and, because she has taken Prozac since 1988, recognized that the medication inside was not Prozac. She testified that she told her mother at that time that she would find out what it was, and took it to C’s the next day. Steven Ciolino at C’s informed Mrs. Rudman that the bottle contained Res-toril. Mrs. Rudman told her mother about it then. She only had possession of the one prescription bottle labelled “Prozac,” and never had any discussions with her mother as to how many pills Mrs. Bookman had taken from that bottle.
Skinner testified that he has been a pharmacist since 1954 and has been employed at C’s since 1988. He stated that he had no independent recollection of filling Mrs. Book-man’s prescriptions, but testified rather as to his customary procedures. In 1990, three full time pharmacists were employed at C’s, with Steven Ciolino filling in part of the time. The drugstore filled about 800 prescriptions per day. Based on the average eight hour day, counsel for plaintiff figured, and Skinner agreed, that the average number of prescriptions filled per hour was 28.5, or one prescription every 2.1 minutes. This took a great deal of concentration, and if interrupted during the process, he would have to start over again. He was often interrupted to answer questions or to answer the telephone. When filling a prescription, Skinner would first receive a computer generated three part label; he would then read the prescription to check for accuracy of the_[¿nformation. The first portion of the label is attached to the prescription; the second part of the label contains refill information and the pharmacist’s name along with the name of the medication, directions, etc. Skinner would then get the medicine, bring it to the counter and check it against the prescription, check it against the computer generated document, count the pills, and put them in the bottles. After stamping his (pharmacist’s) name on the bottle, the contents are again checked to make sure that the medication has been correctly dispensed. According to Skinner, “There is a rule about the whole thing that if there is any doubt about what you’re doing then you don’t do it.” When filling more than one prescription for the same patient, both medications are pulled at the same time; each one is filled separately, as outlined above. After so doing, the bottles are again opened and checked before handing the prescriptions down. Each pharmacist is responsible for checking his own work. Skinner admitted that he has made errors in the past of miscounting pills; he also has erred in putting the wrong pills in the wrong bottle, but due to his checking procedures, this did not result in giving the patient the wrong medication.
Dr. Ruffin testified at trial that when Mrs. Bookman came to see him in 1990, she was experiencing a delayed depression effect to her husband’s death. Initially he planned to use outpatient therapy without medication since this had been helpful in her past treatment. There was no indication that Mrs. Bookman might require hospitalization. However, her condition did not change between May 2 and June 22, so he prescribed the anttjdepressantss Prozac and Restoril. Between June 22 and July 6, he stated that she had become somewhat more restless and had insomnia; therefore, he told her to increase the Restoril to two tablets. When Mrs. Bookman deteriorated and was admitted to the hospital, routine blood work done did not include a blood level of Prozac. According to Dr. Ruffin: “I had assumed that she was on one (1) twenty (20) mg. tablet daily, which I guess can, in some elderly people, produce a reaction like this.”
At the time she was admitted, Dr. Ruffin did not understand what had precipitated the problems. Prozac was given to Mrs. Book-man in the hospital for about the next two weeks, along with other medication until Dr. Ruffin thought that she had had too much of a reaction to it, and cut the amount back to half the dosage, eventually taking her off of it altogether. Between July 16 and August 1, when the Prozac was reduced, Mrs. Bookman did not improve at all. Since finding out that Mrs. Bookman had apparently been taking a *986 double dose of Prozac before entering the hospital, Dr. Ruffin decided that such explained her precipitated reaction. Because Prozac stays in the system, it takes seven to nine days for half the drug to get out of the bloodstream, so that an excessive dose would take two weeks to reach normal levels. Had Dr. Ruffin known of the mix-up,' he would have taken plaintiff off the drug immediately; he stated that it was possible that she would not have had to be hospitalized at all.
When Mrs. Bookman and her daughter showed him the bottle, he recognized that the Restoril bottle had Prozac in it. On cross-examination, |9Pr. Bookman stated that many of his notes on Mrs. Bookman are gone. He recalled, however, that plaintiff had seemed more agitated and upset prior to her visit on July 6. He stated that such restlessness and nervousness is a common side effect in 10-15% of the persons who take it. He did not recall ever telling her to discontinue the Prozac. Mrs. Bookman got a refill on the Restoril on June 29, about one week after getting the original prescription. This indicated to the doctor that she was taking more than one Restoril per day, but he could not be certain how many of which pills Mrs. Bookman had taken.
Dr. Floyd Domer, a doctor of pharmacology at Tulane University, described the chemical effect of Prozac in the brain and body. Dr. Domer described the half life of a drug as the time necessary for the blood concentration to go to one half of the original level. With the metabolite in Prozac, this is three to three and one half weeks — the level of the drug takes that much time to slowly decrease in the bloodstream. The double dose of Prozac and subsequent elevated level of the drug would be compatible with the symptoms she exhibited. If plaintiff was at a toxic level before entering the hospital, continuing the drug afterwards would sustain that toxic level for a longer period of time. Based on the information given to Dr. Domer on plaintiffs dosage, he found that the overdose of Prozac was a cause of Mrs. Bookman’s hospitalization, and that her behavior just prior to her hospitalization was compatible with a toxic level of that drug. When asked if there was any indication that plaintiff would have had excessive levels of | ipProzac in her body but for the double dosage, Dr. Domer stated: “That is really difficult to know. Again, as I understand it, she had only received the drug prior to the misfilling of the prescription for something like three (3) weeks. So, it wasn’t totally established what was going to be her subjective response to the drug. Apparently, she hadn’t exhibited any meaningful level of toxicity, but I couldn’t be sure of that.” Dr. Domer admitted on cross-examination that his information on the blood levels of Prozac and its metabolic effect was not based on a study which has been done on Prozac — the witness had not looked at that particular study, but instead projected his findings from “other drugs that exhibit that general type of metabolism.” Dr. Domer also felt that Mrs. Bookman’s increased agitation prior to July 6 was a possible reaction to Prozac.
Mr. Robert McCrary, a registered pharmacist, testified as an expert witness for plaintiff. In his opinion, 2.1 minutes for filling a prescription “could be considered safe” depending on other circumstances of the business. To fill prescriptions at that rate for eight hours requires intense concentration, and there is a high likelihood of making a mistake especially if there are other interruptions. However, he had no personal information about the plaintiff herself and gave no opinion as to the negligence of the defendants.
Finally, Steven Ciolino testified that Mrs. Rudman had brought the prescription bottles to him and, in his recollection, he thought there were two different versions of a generic Restoril; he did not recall the contents of I li one as Prozac and did not tell Mrs. Rud-man that a mistake had been made by the pharmacy.

ANALYSIS

The applicable legal principles are as follows:
A duty-risk analysis is helpful in resolving a negligence case such as this.
In making the requisite analysis, four questions are to be considered:
(1) Was the conduct in question a cause-in-fact of the resulting harm?
*987 (2) What, if any, duties were owed by the respective parties?
(3) Were the requisite duties breached?
(4) Was the risk and harm caused within the scope of protection afforded by the duty breached?
Mart v. Hill, 505 So.2d 1120 (La.1987).
For plaintiff to recover on a negligence theory, all four inquiries must be affirmatively answered.
Faucheaux v. Terrebonne Consol. Gov., 615 So.2d 289 (La.1993). See also Fisher v. River Oaks, Ltd., 635 So.2d 1209 (La.App. 5 Cir.1994).
Our standard of review has been set in the often quoted case of Rosell v. ESCO, 549 So.2d 840 (La.1989) wherein our Supreme Court stated:
It is well settled that a court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong,” and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel l^that its own evaluations and inferences are as reasonable. The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. In applying the manifestly erroneous — clearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo.
When findings are based on determinations regarding the credibility of witnesses, the manifest error — clearly wrong standard demands great deference to the trier of fact’s findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’s story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder’s finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.
(Citations omitted).
See also Stobart v. State, 617 So.2d 880 (La. 1993). Most recently in Ambrose v. New Orleans, 639 So.2d 216 (La.1994), the court stated thusly:
| ^Notwithstanding the Court’s earlier guidance to reviewing courts in Stobart v. State through DOTD, 617 So.2d 880 (La. 1993), it was not our purpose in that case to mandate that the trial court’s factual determinations cannot ever, or hardly ever, be upset. Although deference to the fact-finder should be accorded, the court of appeal, and the Louisiana Supreme Court, nonetheless have a constitutional duty to review facts. Of course, the reviewing court may not merely decide if it would have found the facts of the case differently. Rather, notwithstanding the belief that they might have decided it differently, the court of appeal should affirm the trial court where the latter’s judgment is not clearly wrong or manifestly erroneous. Because the court of appeal has a constitutional function to perform, it has every right to determine whether the trial court verdict was clearly wrong based on the evidence, or clearly without evidentiary support.
Our review of the ease discloses that the issue of who made the switch in the medications is one which chiefly turns on the credibility of the witnesses, primarily Mrs. *988 Bookman and Mr. SMnner. We find that the apparent determination of that question on the side of the defendants by the jury is reasonable based on the record in its entirety-
The testimony of Mrs. Bookman was occasionally at odds with that of other witnesses in some important respects. She stated that she was not agitated before July 9; her treating physician testified that indeed her restlessness and agitation had increased pri- or to that date — hence his advice to her to take two Restoril pills. Plaintiff did not recall the refill of medication on June 29, verified by her physician. Her version of giving the mislabelled bottle of Prozac to her daughter and finding out about the mix-up differs markedly from the sequence of events related by Mrs. Rudman. | ^Further, plaintiff also stated that she always finished one bottle of medication before starting the next one. June 22 through July 9 is a period of eighteen days, for which the evidence shows Mrs. Bookman had a supply of 40 Restoril tablets (prior to the July 9 refill). Even if she had taken two tablets every night, which she testified she did not, Mrs. Bookman would not have begun to take the “switched” medication until the evening of July 12. Yet, plaintiff testified that she began to feel increasing agitation on July 9 or the next day, which she attributed to the Prozac supposedly taken from the Restoril bottle. Such discrepancies lead to the conclusion that either she did not take the medication as she said she did, or the change in her behavior began prior to the time she would have taken the double dose of Prozac.
Mrs. Bookman stated that she did not remember a number of things because of her condition during this period. (We note also that, although Mrs. Bookman testified that she stopped taking Prozac on her own, attributing her increasing problems to that drug, she also testified that she has again taken Prozac since being released from the hospital).
The opinions of Dr. Ruffin and Dr. Domer on the cause of the hospitalization were largely based on information given to them by Mrs. Bookman as to when she began to take two Prozac per day. Further, as noted by Dr. Domer, the effect of the 'presented dosage on plaintiff was never established. Certainly there was ample basis for the jury to conclude that plaintiffs psychological deterioration began prior to the time that she | igwould have begun to take medication from the third “Restoril” bottle, on July 12. There is Dr. Ruffin’s testimony to that effect; additionally, Dr. Ruffin stated that the prescribed dose could have produced, in elderly people such as Mrs. Bookman, the reaction which resulted in her hospitalization. Thus, serious doubt was cast on the initial inquiry of whether or not any conduct engaged in by the defendants was a cause in fact of the plaintiffs problem. To the extent that the jury did not find such cause in fact, we see no manifest error. The jury could easily have concluded that Mrs. Bookman’s problems were a result of either the course of her illness, or a reaction to the prescribed dose of medication, or both.
While Mr. Skinner did not have specific recollection of this particular event, his testimony as to his usual practices was consistent. Plaintiff presented no evidence to contradict his statements that he always double checks his work and that he has never had a complaint of having misfilled a prescription with the wrong medication. There is no reason in the record to discredit his testimony.
A jury is not required to disregard testimony merely because the witness may be interested or biased. It is within the province of the trier of fact to place more probative value on the testimony of an interested witness than that of a disinterest one. Rosell, supra.
In summary, there was enough evidence in the record to form a basis for the jury’s rejection of plaintiffs version of events. In the present ease, we find no manifest error in the reasonable evaluation of credibility made | -ujby the jury, and we see no basis for disturbing the reasonable inference of fact drawn by them. We conclude that the jury was presented with two permissible views of the evidence, and thus its choice cannot be clearly wrong. Stobart, supra. Accordingly we are not at liberty to disturb its findings of fact and resultant verdict.
*989 For the foregoing reasons, the verdict and judgment are affirmed. Appellant is assessed all costs of this appeal.
AFFIRMED.