702 So.2d 768 (1997)
Yvonne BLANCHARD, et al., Plaintiffs-Appellants,
v.
STATE of Louisiana, Through the PARKS AND RECREATION COMMISSION, et al., Defendants-Appellees.
No. 97-195.
Court of Appeal of Louisiana, Third Circuit.
October 8, 1997.
*769 David Benoit, Breaux Bridge, for Yvonne Blanchard, et al.
Richard Phillip Ieyoub, Atty. Gen., Baton Rouge, Charles T. Williams, Jr., John Elliott Baker, Metairie, Ed. M. Campbell, Asst. Atty. Gen., for State, through the Parks & Recreation, et al.
Before DOUCET, C.J., and DECUIR and AMY, JJ.
AMY, Judge.
Yvonne Blanchard filed suit against the defendants on behalf of herself and her children following the 1990 lightning-related death of her husband, Larry Blanchard. The incident occurred underneath a Cypremort Point State Park picnic pavilion which, according to the plaintiffs, was defective due to a lack of lightning protection or warning. The trial court ruled in favor of the defendants finding that the shelter was not defective and that the State owed no duty to install lightning protection. We affirm the decision of the trial court.

DISCUSSION OF THE RECORD
The record indicates that, on the morning of July 12, 1990, Larry and Yvonne Blanchard and their three children, Stacey, Mindy, and Jason, traveled from their Breaux Bridge home to Cypremort Point State Park. *770 Yvonne Blanchard testified at trial that Larry had just returned from his work offshore and that the family planned to picnic and spend the day at the park. She stated that the weather was cloudy and dreary that morning, but that it was not raining.
Mrs. Blanchard testified that when the family arrived at the park, they paid the entrance fee and her husband and the park attendant briefly discussed the weather. Mrs. Blanchard stated that the attendant told them that the weather would hold out and that the family then proceeded to the picnic area which, photos reveal, was located at the water's edge. She testified that after the family got to a picnic pavilion or "shelter," as referred to by the plaintiffs, the weather grew increasingly ominous and that the family remained under the pavilion to stay out of the rain. She stated that the family became concerned, but that Mr. Blanchard felt that the family would be safer under the pavilion rather than returning to the car.
Mrs. Blanchard testified that after she and her husband discussed the safety of remaining under the shelter there was a "very loud noise" and that she saw a "bluish white" light around Mr. Blanchard. She stated that this lightning strike knocked her to the ground as well, but that after she got up and went to care for her son Jason, she noticed that her husband was lying on the cement floor of the pavilion and that he did not respond when she spoke to him. The couple's oldest daughter, Stacey, testified that she too recalled the light and "tremendous noise" and that she stayed with her father while the family went for help. Park employees and emergency personnel soon arrived to offer assistance. The record reveals that the personnel performed CPR and rendered emergency care, but that Mr. Blanchard was evacuated from the park by air. Mrs. Blanchard testified that there was not room for her to travel with her husband in the helicopter, but that she accompanied the emergency personnel in the ambulance. She stated that she knew her husband had died when transmissions ceased between the helicopter and ground ambulance personnel.
The record indicates that the Blanchard children were told of their father's death when they arrived at the hospital and that they too had sustained injuries from the lightning. Mrs. Blanchard testified that her injuries and those of her children required only a single visit to the doctor. She did state, however, that she had visited a clinical psychologist to alleviate mental stress and that these visits had been beneficial to her.
Mrs. Blanchard filed suit on behalf of herself and her children against the State of Louisiana through the Department of Culture, Recreation and Tourism, and through the Office of Facility Planning and Control. The plaintiffs alleged that they were due damages as Mr. Blanchard was struck by lightning either directly or indirectly and subsequently died from electrocution. They allege that the facilities at Cypremort Point are owned by the State and, accordingly, that the State failed to consider the high occurrence of storms in the area and take appropriate steps to protect the shelter from lightning. The plaintiffs also sought damages for mental anguish[1] and damages for their own physical injuries.
Following a September 1996 bench trial, the trial court found in favor of the defendants. In the written reasons for judgment, the trial court concluded that "the plaintiffs failed to prove that the picnic pavilion was defective."
The plaintiffs now appeal the trial court's conclusion and assert the following:
Assignment of Error No. 1:
The trial court erred, as a matter of law, in finding no defect in a shelter that, rather than afford protection, greatly increased the risk of harm to persons who sought refuge under it.
Assignment of Error No. 2:
The trial court erred in not awarding damages to the plaintiffs.

*771 LAW

Duty
The plaintiffs' central contention is that the trial court erred in failing to find the picnic shelter or pavilion defective. The plaintiffs point to several factors which they believe demonstrate responsibility under either a negligence or strict liability theory of recovery. First, the plaintiffs maintain that not only did the shelter fail to protect the visitors from lightning but, instead, the pavilion attracted lightning, thereby increasing the risk of harm. Further, the plaintiffs argue that the State was aware of the structure's proximity to the water's edge and that it was the tallest structure in the area giving notice to the necessity of lightning protection which, according to the plaintiffs, was an inexpensive addition to the construction. Finally, the plaintiffs argue that guidelines calling for such protection are contained within National Fire Protection Code 78 which, they maintain, was adopted by the State, either de facto or de jure, and which should have been followed. Given these factors, the plaintiffs contend that the trial court erred in failing to find the pavilion defective.
The State maintains that the pavilion was not built for lightning protection and that such protection was not required by any code adopted by the State in effect at the time of either the pavilion's construction or at the time of the accident. The State also argues that the plaintiffs did not prove that the absence of lightning protection caused Mr. Blanchard's death as evidence was presented indicating that such protection might not have eliminated the problem or that the family was victim not to a direct lightning strike, but to a type of lightning called a "side flash." The State further argues that the dangerous "thing" was not the pavilion, but rather the lightning which, of course, was not within the custody of the State. Alternatively, should this court reverse the trial court's ruling, the State maintains that implementation of any protection was purely a discretionary act and that the State cannot be liable for failure to perform a discretionary act pursuant to La.R.S. 9:2798.1.[2]
In the present case, the plaintiffs sought recovery under both negligence[3] and strict liability[4] theories. However, despite these separate theories of recovery, the courts have, in essence, reviewed these theories in a similar manner. Oster v. DOTD, 582 So.2d 1285 (La.1991); Maxwell v. Board of Trustees for State Colleges and Universities, 96-1207 (La.App. 3 Cir. 3/19/97); 692 So.2d 641, writ denied, 97-0996 (La.6/13/97); 695 So.2d 987. Under either theory, the *772 plaintiffs must prove the following: 1) The thing causing the damage was in the defendant's custody; 2) The thing contained a defect that created an unreasonable risk of harm to the plaintiff; and 3) The defective condition caused the plaintiff's injuries. Oster, 582 So.2d 1285 (citing Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990)). See also Maxwell, 96-1207; 692 So.2d 641.
Unlike negligence cases, however, if the suit is brought under a strict liability theory, the plaintiff is not required to prove that the defendant had scienter or notice of the defect. Oster, 582 So.2d 1285. Despite this general rule, the plaintiffs are required, in a suit brought against a public entity, to prove that the defendant had "actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so." La.R.S. 9:2800(B).
In a negligence suit, the defendant's awareness of a defective condition which gives rise to a duty to act. However, in a strict liability suit, the defendant's legal relationship with the defective property gives rise to that duty. Oster, 582 So.2d 1285. Under either theory, the absence of an unreasonably dangerous condition implies the absence of a duty by the defendant. Id. As such, the court, in the present case, must determine whether the condition of the picnic pavilion at Cypremort Point was an unreasonable risk of harm. Following the reasoning of the supreme court in Oster, if, in fact, the pavilion did not present an unreasonable risk of harm, there would have been no duty owed by the defendant.
The Louisiana Supreme Court has previously discussed the similarities in performing a duty-risk and a unreasonable risk of harm analysis:
The judicial process involved in deciding whether a risk is unreasonable under Article 2317 is similar to that employed in determining whether a risk is unreasonable in a traditional negligence problem. Hunt v. City Stores Inc., 387 So.2d 585 (La.1980), and in deciding the scope of duty or legal cause under the duty/risk analysis. Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972); Green, The Causal Relation Issue, 60 Mich.L.Rev. 543, 563 (1962). This is not because strict liability under Article 2317 is equivalent to liability for negligence, but because in both delictual areas the judge is called upon to decide questions of social utility that require him to consider the particular case in terms of moral, social and economic considerations, in the same way that the legislator finds the standards or patterns of utility and morals in the life of the community. B. Cardozo, The Nature of the Judicial Process, at p. 105 (1921); See also, Green, The Causal Relation Issue, 60 Mich.L.Rev. 543 (1962).
Entrevia v. Hood, 427 So.2d 1146, 1149-50 (La.1983). The necessity of making such a determination in light of moral, economic, and social considerations was recently reiterated by the supreme court in Boyle v. Board of Supervisors, 96-1158 (La.1/14/97); 685 So.2d 1080.
This court has previously stated that the unreasonable risk of harm analysis is a factual determination and, therefore, subject to the manifest error standard of review.[5]Maxwell, 96-1207; 692 So.2d 641; Tullis v. Rapides Parish Police Jury, et al., 95-905 (La.App. 3 Cir. 1/17/96); 670 So.2d 245, writ not considered, 96-0444 (La.3/29/96); 670 So.2d 1241; White v. Louviere, 95-610 (La. App. 3 Cir. 11/2/95); 664 So.2d 603. The necessity of fact-specific determinations in strict liability cases was highlighted by Justice Lemmon in his concurrence to Entrevia:
Determination of the issue concerning the duty to remedy involves the question of whether the owner failed to prevent the particular risk from resulting in harm to this particular plaintiff under these particular circumstances. *773 Entrevia, 427 So.2d at 1151 (Lemmon, J. concurring)(footnote omitted).
We also recognize the importance of a fact-specific analysis to the duty-risk determination required in negligence cases. However, in this type of determination, the Louisiana Supreme Court has found the existence of a duty to be a question of law and the determination of breach of that duty a question of fact. Mundy v. Department of Health and Human Resources, 620 So.2d 811 (La.1993); Faucheaux v. Terrebonne Consolidated Government, et al., 615 So.2d 289 (La.1993). Discussing the nature of the duty-risk analysis, Professors Maraist and Galligan have noted that the exact nature of the determination may vary. They write:
Duty generally is considered a question of law for the judge, but legal causation is a mixed question of law and fact that the jury decides if reasonable minds could differ. Thus the place in the negligence formula at which the specific risk inquiry is made may control whether the decision is always made by the judge or is sometimes by a jury. It is not surprising to find a lack of uniformity among jurisdictions, or, indeed, within jurisdictions, as to whether the specific risk inquiry is one of duty (for the court) or one of breach of legal cause (for the jury).
FRANK L. MARAIST & THOMAS C. GALLIGAN, LOUISIANA TORT LAW § 5-2, at 102 (1996) (emphasis added).
In the instant case, the more general duty is established by either La.Civ.Code art. 2315 or by La.Civ.Code arts. 2317 and 2322. However, the more specific duty at issue involves the State's requirement to afford either lightning protection or warning signs at this particular picnic pavilion under these circumstances.
In the Reasons for Judgment, the trial court initially cited Fontenot v. Fontenot, 93-2479 (La.4/11/94); 635 So.2d 219, for the proposition that, in a negligence suit, the plaintiffs are required to prove all of the elements of strict liability in addition to the element of scienter. After so stating, the trial court went on to find the following:
Thus, under either theory of recovery the plaintiff had the burden of proving that the picnic pavilion was defective due to lack of lightning protection or warning. Taking the testimony adduced at trial in the light most beneficial to the plaintiffs, the plaintiffs failed to prove that the picnic pavilion was defective. At best, the plaintiffs presented evidence that the area of the Cypremort Point State Park on average would be struck by lightning once every twenty-five years.[6] This statistic would become increasingly remote is [sic] one were to consider whether a person were to be injured by that strike. For these reasons, this Court finds that the State owned [sic] no duty to provide either lightning protection or a warning.
Given the record before us, we do not conclude that the trial court erred in finding that the State owed no duty to provide lightning protection or warning signs. Nor do we conclude that the picnic pavilion presented an unreasonable risk of harm so as to constitute a defective condition on the premises of the defendant.
The plaintiffs' case consisted not only of the eye-witness testimony of Mr. Blanchard's family as to what happened following the lightning strike, but also of experts who testified as to the occurrence of lightning storms in the area, architecture, codal requirements which may have been in effect during the *774 pavilion's construction, and lightning protection. Among those testifying for the plaintiff was Dr. Martin A. Uman, a professor of Electrical Engineering at the University of Florida. Dr. Uman, accepted as an expert in the field of lightning, stated the following with regard to the unprotected picnic pavilion: "[I]t's a fairly good shelter from sun and it's not a bad shelter from rain if it's not blowing sideways too much. It's a very bad shelter from the point of view of lightning protection because the people who get under there are in considerable risk if the shelter gets struck by lightning, and the shelter will attract appreciable lightning to it." He also stated that lightning protection, if installed according to code, would have been very effective and would have been minimal in cost. Dr. Uman testified that, without this protection, the shelter was a dangerous location during a lightning storm and that an all-metal car would have been less dangerous.
Dr. Uman also testified that Louisiana is in a higher than average zone for lightning. Referencing maps from The National Lightning Detection system, Dr. Uman concluded that, in 1991, Louisiana experienced "five to seven lightnings per square kilometer....in that area." He stated that this number may vary yearly and that part of this variance depends upon the size of the area studied. Dr. Uman later testified that, with regard to the frequency of the picnic pavilion being struck by lightning, "one of the shelters in the Park there will get hit about every twenty-five (25) years on average."
Rob Perillo, a meteorologist, also testified regarding South Louisiana's proclivity for thunderstorms. He stated that "[i]n South Louisiana in general probably between there are seventy (70) to (80) thunderstorm days per year meaning thunder is heard at a general location in this area every year." He also stated that coastal areas have a slightly elevated number of storms.
The plaintiffs also presented testimony to support their argument that the State may be mandated to follow NFPA 78, a code related to lightning protection, because of a reference to it in the National Electric Code, a code statutorily included in the Louisiana Building Code. However, the plaintiffs admit in brief that whether NFPA 78 is mandated is unsettled, but they continue to argue that NFPA 78 has been adopted de jure by its use in other projects and that the failure to follow it in this instance renders the pavilion defective. The plaintiffs questioned several experts as to its applicability. For example, Richard Weimer, an architect who completed two projects for the State at Grand Isle, testified that lightning protection was used at the Grand Isle facilities and that NFPA 78 is "normally used to design lightning protection systems." However, Kirby Pecot, an architect initially presented by the plaintiffs, but then called for the defense, testified that he did not believe that NFPA 78 was encompassed in the Louisiana Building Code. Mr. Pecot also stated that he could recall two projects he had completed in which lightning protection was included. One of these, a park pavilion, contained lightning protection because of his knowledge of the instant matter.
The plaintiffs' evidence was, indeed, impressive regarding the creation of lightning and South Louisiana's proclivity for lightning storms. However, under the facts of this case, we do not find the evidence or testimony regarding the number of strikes or the attractiveness of the pavilion to lightning to require that the state park take action in this instance. There may, of course, be situations where property is unusually attractive or, by its nature, present an unusually dangerous risk to individuals. We do not find such a condition here.
As we affirm the trial court's findings, we address neither damages nor the State's alternative argument that it is statutorily immune from liability.

DECREE
For the foregoing reasons, the decision of the trial court is affirmed. All costs of this proceeding are assigned to the plaintiffs, Yvonne Blanchard, et al.
AFFIRMED.
NOTES
[1] The Louisiana Supreme Court has previously recognized claims for mental anguish which arise out of an injury to a third person. See Lejeune v. Rayne Branch Hospital, 556 So.2d 559 (La.1990). These claims, however, are only allowable under certain circumstances. Id. This category of claims was codified in 1991 by the enactment of La.Civ.Code art. 2315.6.
[2] La.R.S. 9:2798.1, as applicable to the present matter, provides, in part:

§ 2798.1. Policy-making or discretionary acts or omissions of public entities or their officers or employees
B. Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policy-making or discretionary acts when such acts are within the course and scope of their lawful powers and duties.
C. The provisions of Subsection B of this Section are not applicable:
(1) To acts or omissions which are not reasonably related to the legitimate governmental objective for which the policy-making or discretionary power exists; or
(2) To acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct.
[3] Article 2315 of the Louisiana Civil Code, the general negligence provision, contains the following:

Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.
Damages may include loss of consortium, service, and society, and shall be recoverable by the same respective categories of persons who would have had a cause of action for wrongful death of an injured person.
[4] Article 2317 of the Louisiana Civil Code, the general strict liability provision, provided the following at the time of the alleged incident:

We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications.
The modification allegedly applicable to the instant matter is found in La.Civ.Code art. 2322. At the time of the incident now at issue, the civil code provided the following:
The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction.
[5] We are mindful, however, that some courts have also found the unreasonable risk of harm analysis to be both a legal and a factual determination. See, for example, Migues v. City of Lake Charles, 96-626 (La.App. 3 Cir. 11/6/96); 682 So.2d 946; Phipps v. Amtrak, 94-1876 (La.App. 1 Cir. 11/20/95); 666 So.2d 341, writ denied, 95-3012 (La.2/28/96); 668 So.2d 368.
[6] We note that the plaintiffs contend that "[t]he trial court, in its Reasons for Ruling, misunderstood the expert testimony and stated that the Cypremort area would be struck by lightning only once every twenty five years []. Rather it was any one shelter that would be struck every twenty five years, with the State, on average, being struck five to seven times per year per square kilometer [ ]. Appellants believe this fundamental misapprehension of a crucial and basic fact by the trial court led to its erroneous conclusion that the shelter was not defective." In fact, Dr. Robert Uman, an expert presented by the plaintiffs testified that "one of the shelters in the Park there will get hit about every twenty-five (25) years on average." We recognize that this expert's testimony related to the individual pavilions rather than the entire park. However, we do not conclude that had the trial court correctly stated the correct statistic, that the court would have been required to conclude that lightning strikes were so probable that the pavilion was defective.