663 So.2d 127 (1995)
Robert N. AYRES, Plaintiff-Appellant,
v.
BEAUREGARD ELECTRIC COOPERATIVE, INC., et al., Defendants-Appellees.
No. 94-811.
Court of Appeal of Louisiana, Third Circuit.
September 6, 1995.
Writs Denied December 15, 1995.
*129 James L. Bates Jr., Metairie, for Robert N. Ayres.
Charles Harper, Lake Charles, for Beauregard Electric Cooperative Inc., et al.
Before WOODARD, DECUIR, and PETERS, JJ.
PETERS, Judge.
The plaintiff, Robert N. Ayres, filed this suit against several defendants to recover damages he sustained as a result of an oil field accident which occurred in Beauregard Parish near Fields, Louisiana, on June 8, 1989. At trial the only remaining defendants were Beauregard Electric Cooperative, Inc. (Beauregard Electric) and its liability insurer, Federated Rural Electric Insurance Corporation. A jury trial resulted in a verdict in favor of the defendants, and the plaintiff has appealed.
It is undisputed that on June 8, 1989, the plaintiff sustained injuries as a result of an *130 accident at an oil field production location in Beauregard Parish. At the time, he was employed by John Ayres Corporation (his father's corporation), which engaged in oil field chemical sales and service. Included within the corporate activity were the testing and treating of petroleum products at production sites.
The accident occurred at an oil lease in Section 27 of Beauregard Parish. On the day of the accident, the plaintiff was responding to the lease operator's request for assistance with an excess water content problem in the oil pumped from the subsurface. Because the oil and water were in the form of an emulsion, the oil was unmarketable. The plaintiff's job was to separate the oil and water so the water could be removed. The separation was to be accomplished by applying a chemical to the emulsion to cause the water to separate.
To perform this separation procedure, one end of an air hose is connected to a tank of nitrogen and the other to the end of a twenty-foot aluminum pole known as a "stinger." The stinger is then lowered into the oil storage tank through an opening in the top of the tank (commonly called a "thief hatch") so that the end connected to the air hose rests on the bottom of the tank. The chemical is then added, and the nitrogen is used to mix the emulsion and chemical. The plaintiff had been performing this type of activity for approximately eleven years before the accident.
The oil produced on the lease was stored in four oil storage tanks located on the east side of an access road serving the lease. The tanks were twelve feet in diameter and approximately twenty feet tall and were arranged in a square. They had been placed on the location in late 1981 or early 1982. In the twenty-six-inch space between the tanks, a catwalk ran east and west, thus allowing access to the top of each tank. Each thief hatch was located on that side of the tank closest to the catwalk. The center of each thief hatch was eight and one-half inches from the edge of each tank. A stairwell connected the eastern end of the catwalk to the ground and descended from east to west to the ground. The two northernmost tanks were served by one fill line and the southernmost tanks by another. Both fill lines were two and three-eighths inches in diameter and ran from the producing well or wells to a point one foot ten inches from the west side of the tanks and two feet three inches from the center of the catwalk. The fill lines then ran vertically (and parallel to the tanks) to a point nineteen inches above the tanks. The lines then extended easterly (and parallel to the top of the tanks) a sufficient distance to service the easternmost tanks.
At about the same time the tanks were placed on the lease, three bare 14,400-volt energized electrical distribution lines were installed for Beauregard Electric. These lines ran north and south along the same side of the access road as the tanks and were continually maintained by Beauregard Electric thereafter. The three lines were spaced three feet six inches apart, and below the middle line was a neutral line. The energized line closest to the oil tanks was two feet horizontally from the fill line attached to the nearest oil tank, approximately three feet ten inches horizontally from the shell of the tank itself, and approximately nine feet ten inches horizontally from the center of the thief hatch of the tank. It was five feet vertically from the fill line and six feet nine and three-eighths inches vertically from the tank.
In the early afternoon of June 8, 1989, the plaintiff drove to the lease location alone. In his truck he carried a bottle of nitrogen, an air hose, a stinger, and two buckets of chemical emulsion breakers. One of these chemicals was D-3, an oil soluble hydrocarbon, and the other was glacial acetic acid. Ayres removed the nitrogen bottle from the truck and moved it to the base of the stairway. He then connected the air hose to the nitrogen bottle and the stinger and climbed the stairway to the catwalk carrying the stinger and a bucket of chemical. At the top of the tank, he opened the thief hatch and inserted the stinger. What happened next is the dispute in this case.
The plaintiff contends that when he inserted the stinger it touched one of the overhead energized wires thereby causing an electrical arc which started a fire which caused his injuries. The defendants suggest no fire occurred, *131 deny that the plaintiff ever came in contact with the electrical lines, and argue that the plaintiff actually received his injuries from glacial acetic acid.

ANALYSIS
The defendants argue that the sole issue on appeal is factual and the jury's decision should not be disturbed absent manifest error. We agree that the standard of review is the manifest error or clearly wrong standard. Stobart v. State Through Dep't of Transp. & Dev., 617 So.2d 880 (La.1993). This court has a constitutional duty to review facts. Ambrose v. New Orleans Police Dep't Ambulance Serv., 93-3099, 93-3110, 93-3112 (La.7/5/94); 639 So.2d 216. Because we have this duty, we have "every right to determine whether the [jury] verdict was clearly wrong based on the evidence, or clearly without evidentiary support." Id. at 221. In fulfilling our constitutional obligation, we must review the record in its entirety and not just to find some evidence to support or controvert the fact finder's determinations. Stobart, 617 So.2d 880. After review of the entire record, the issue we should resolve is whether the jury's conclusion is a reasonable one, not whether it is right or wrong. Id. "Thus, where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." Id. at 883.
In reviewing this case, we first note that the verdict gives little guidance concerning the jury's conclusions on certain factual issues. The jury was given a series of interrogatories to answer but answered only the first one which read as follows:
Was Beauregard Electric Cooperative negligent and, if so, was that negligence a legal or proximate cause of the accident?
This interrogatory was answered in the negative thereby requiring the jury to deliberate no further. We do not know if the jury concluded Beauregard Electric was not negligent or if it concluded Beauregard Electric was negligent but that the negligence was not a legal cause of the accident. Regardless, for the following reasons, we conclude that the jury was clearly wrong in its ultimate decision. We find that Beauregard Electric was negligent and its negligence was a legal or proximate cause of the accident.

Negligence Question
We may resolve a negligence case through the duty-risk analysis. The analysis requires answering four questions:
(1) Was the conduct in question a cause-in-fact of the resulting harm?
(2) What, if any, duties were owed by the respective parties?
(3) Were the requisite duties breached?
(4) Was the risk and harm caused within the scope of protection afforded by the duty breached?
Faucheaux v. Terrebonne Consol. Gov't, 615 So.2d 289, 292 (La.1993).

Cause-in-Fact Element
This element of proof is basically factual. It "relates solely to conduct, an act or omission that results in harm or damage to another." Weaver v. Valley Elec. Membership Corp., 615 So.2d 1375, 1381 (La.App. 2 Cir.1993). All that is required for conduct to be a cause-in-fact of the harm complained of is that it be a "substantial factor in bringing about that harm." Dixie Drive It Yourself Sys. New Orleans Co., Inc. v. Am. Beverage Co., 242 La. 471, 137 So.2d 298, 302 (1962).
Cause-in-fact is generally a "but for" inquiry; if the plaintiff probably would not have sustained the injuries but for the defendant's substandard conduct, such conduct is a cause-in-fact. To the extent that the defendant's actions had something to do with the injury the plaintiff sustained, the test of a factual, causal relationship is met.
Faucheaux, 615 So.2d at 292 (citation omitted).
In answering the cause-in-fact question we must first address the nature of the plaintiff's physical injuries. That is to say, were his burns thermal, electrical, or chemical in nature?
The plaintiff contends that as he inserted the stinger into the thief hatch, a huge ball of fire came rolling out of the tank *132 toward his face. The injuries he received caused him to become disoriented and confused. When he returned to his truck, he saw the bucket of glacial acetic acid in the back of the truck and concluded that somehow he had spilled it on himself. Because he was confused, he first informed the health care providers who treated him that he thought he had spilled the acid on himself. However, the day after the accident, the bucket of acid was found unopened in the plaintiff's truck at the DeQuincy Memorial Hospital parking lot. Additionally, Martha Guillory, the registered nurse on duty at DeQuincy Memorial where Ayres first presented himself, observed that his shirt was burned off and he had blisters. The plaintiff introduced into evidence a piece of the shirt immersed in a bottle of glacial acetic acid; no destruction of this piece of shirt was evident as a result of the immersion.
Two of the physicians who saw the plaintiff, Dr. Kevin Mocklin and Dr. Ralph Colpitts, concluded that the plaintiff's injuries were thermal in nature. Dr. Mocklin, a Lake Charles, Louisiana internist and the plaintiff's brother-in-law, began treating Ayres at the Lake Charles Memorial Hospital the day of the accident. His initial diagnosis, based on the history from his obviously confused and medication-influenced, patient, was that of chemical burns. However, thereafter he reassessed his diagnosis and concluded the injuries were thermal rather than chemical in nature. His later diagnosis was based partially on the plaintiff's recollection of events after the initial shock subsided and partially on the doctor's examination of the plaintiff's jeans. The doctor described the pants as being charred, as having a smokey smell to them, and as looking like they had been burned by heat. Having seen clothing burned by chemicals and clothing burned by heat, he concluded these had been burned by heat. Dr. Colpitts, a Lake Charles, Louisiana plastic surgeon, was responsible for the plaintiff's long-term treatment, and he concluded the injuries resulted from thermal energy.
Thomas Lueck and Scott Ayres were at the accident scene the morning of June 9, 1989. Lueck was employed by John Ayres Corporation at the time as a service representative, and he was the individual who had bucketed the glacial acetic acid. Scott Ayres is the plaintiff's brother and was employed by John Ayres Corporation as a salesman. Both testified that when they arrived one of the oil tanks was on fire and they were present when the fire was extinguished by a third person. Scott Ayres specifically recalled that the first tank on the left, or the tank on the northwest corner, was on fire. They were also the individuals who discovered the unopened glacial acetic acid in the plaintiff's truck at the DeQuincy Memorial Hospital.
The testimony of the experts is in conflict. Judd William Clayton, Jr., an electrical engineer and the plaintiff's expert, testified that on his investigation of the scene on February 20, 1990, he found the thief hatch discolored and deformed by heat. He also explained that glacial acetic acid could not have started a fire. The defendants' expert, Eric C. Jackson, an electrical engineer, did not conduct a site investigation until August of 1991, or over two years after the accident. He testified that he found no evidence of fire damage to the hatch but did observe some fracture-type damage to part of the hatch material. He removed a piece of the hatch and had it tested by Dr. Thomas E. Shelton, a Baton Rouge, Louisiana metallurgist. According to Jackson, Dr. Shelton told him he found no signs of oxidation that would have contributed to the metal failure but that he [Dr. Shelton] attributed the failure to mechanical application of a load or a mechanical failure. However, the fact that there was not adequate oxidation to contribute to the metal failure does not, by itself, rule out that a fire occurred, particularly when this analysis occurred over two years later and there is no evidence of other activity involving the thief hatch in the interim.
The overwhelming evidence is that a fire occurred and the plaintiff sustained his injuries as a result of thermal energy. Assuming the jury concluded otherwise, that conclusion was manifestly erroneous. Having answered that question, the next factual issue to be resolved is whether the stinger came in contact with the energized lines.
*133 Lueck found a stinger located halfway up the stairway the day after the accident, and according to him, it was burned and melted approximately one to two feet from the top and looked like something had shorted out against it. Scott Ayres also testified that he remembered seeing a mark on the stinger but that he did not really inspect it too closely. Both agreed that the stinger was still operational. Apparently the stinger was placed back into service by the plaintiff's employer and by trial could not be found. Lueck completed the job the plaintiff had started the day before. In doing so, he modified his method of inserting the stinger out of concern for the close proximity of the electrical lines.
Two Beauregard Electric employees, Harvey Ferguson and Douglas M. Watson, went to the scene on November 12, 1990, and attempted to examine the lines in place. Although they claimed to have found no arcing or damage to the lines, they both acknowledged that this examination was the first time they were even aware of the lawsuit. It is questionable that they knew what they were looking for.
The lines were moved to the west side of the access road on April 26, 1991. When the lines were dropped to the ground, Watson claims to have carefully examined them but found no damage. However, the record does not reflect exactly which portion of the line he inspected. As described below, the extent of the inspection is critical to the evaluation of this case.
The testimony of the experts is in conflict on this issue as well. Clayton claims to have seen a darkened charcoal area on the easternmost primary at a point immediately above the center of the stairway. He described the area as being about three inches long and explained the discoloration as being typical of contact with a power line. He was of the opinion that the stinger had come in contact with the easternmost energized line at this point and this contact was the source that ignited the oil fumes. He discounted Watson's inability to find anything, suggesting Watson did not know what to look for. Jackson's examination of the line occurred after it had been moved. He began at a point about midway between the two tanks and went ten to twelve feet to each side of that point examining the wire with a telephoto lens. He found no indication of electric contact to the line. However, we note that the transfer of the line across the road significantly altered the location of the point of contact so that it is questionable whether Jackson examined a sufficient amount of line to rule out a specific point of contact.
The weight to be given to the testimony of expert witnesses depends largely on their qualifications, their experience, and the facts on which they base their opinions. Cockerham v. Atl. Richfield Co., 615 So.2d 547 (La.App. 3 Cir.), writ denied, 623 So.2d 1303 (La.1993); Thomas v. Petrolane Gas Serv. Ltd Partnership, 588 So.2d 711 (La.App. 2 Cir.1991), writ denied, 590 So.2d 1201 (La.1992). Thus, such an opinion may be rejected when based upon assumed facts not supported by the record. Id. The fact finder should consider the education and experience of the expert in the particular science or field, the reasons given in support of the opinion, and the other evidence which supports or detracts therefrom. Cockerham, 615 So.2d 547.
Our review of the testimony concerning the actual contact point between the stinger and the energized lines causes us to conclude that in all probability neither Clayton, Jackson, nor Watson performed an adequate examination with reference to locating the contact point. The error inherent in their observations has to do with the area in which they were looking. Each assumed the contact would have occurred at a point where the energized lines crossed the catwalk. This would have been the proper place to look if the plaintiff had attempted to insert the stinger into the tank in a direction almost parallel to the catwalk. However, insertion at that angle would have been difficult if not impossible. At that angle, the end of the stinger would have almost immediately contacted the curved eastern side of the tank. One would logically expect the stinger to be inserted in a more northeasterly to northerly direction to take advantage of the full size of the tank. Such a method of insertion would account for the described *134 damage to the top of the stinger and for the fact that the stinger did not drop into the tank when the explosion occurred. The more logical location for the contact point can easily be calculated by use of basic mathematics. The Pythagorean theorem states that the hypotenuse of a right triangle is equal to the square root of the sum of the squares of the other two sides. One can easily visualize the distance from the thief hatch to a point directly below the closest energized line as one side of a right triangle and the distance from that point up to the energized line as the other. The stinger would be the hypotenuse of that right triangle. Thus, assuming the damage to the stinger was located two feet from the top of the stinger as testified to by Lueck, and assuming the stinger was placed into the thief hatch at an angle parallel to the catwalk, the distance between the thief hatch and the energized line would be approximately twelve feet. This would suggest that approximately six feet of the stinger was in the tank when the explosion occurred, and the stinger would have been expected to fall into the tank. However, if, as the plaintiff testified, the stinger was over his left shoulder, he would have had to swing it toward the south or southwest to insert it into the tank, and the distance between the thief hatch and the energized lines along the stinger rod would increase significantly. Thus, the point of contact could have been in an area not inspected by the various individuals.
The defendants also argue that if the pole had come in contact with the energized line, it would have sustained catastrophic damage and would not have been reusable. This is highly probable if the stinger had actually sustained the full current of the energized line. However, the energy transferred could have been substantially less with corresponding light damage. All that was required for this accident to occur was a source of the spark that ignited the fumes in the oil tank. The evidence establishes that the stinger became energized by contact with Beauregard Electric's lines and that energy was the spark that ignited the tank fire. Because of that finding, we conclude that the location of the energized lines was a cause-in-fact of the plaintiff's injuries.

Duty and Breach Elements
We will next evaluate what duties were owed by Beauregard Electric and whether these duties were breached. Whether a duty exists is a question of law. Faucheaux, 615 So.2d 289.
Simply put, the inquiry is whether the plaintiff has any lawstatutory, jurisprudential, or arising from general principles of faultto support his claim.
Id. at 292.
A power company must exercise "the utmost care to reduce hazards to life as far as practicable" in maintaining and employing high power lines. Levi v. S.W. La. Elec. Membership Coop., 542 So.2d 1081, 1084 (La.1989). This includes the duty to inspect its wires and other equipment on a reasonable schedule to discover and correct hazards and defects. Id. If it is reasonably anticipated that persons might come in contact with energized lines, the power company must insulate them, post adequate warning signs, or take other precautions reasonable under the circumstances to prevent injury. Dixon v. Northeast La. Power Coop., Inc., 524 So.2d 35 (La.App. 2 Cir.), writ denied, 526 So.2d 809 (La.1988).
These jurisprudential tenets of safety are also recognized by the industry through various safety codes. In this case, excerpts of the NATIONAL ELECTRICAL SAFETY CODE (1981) (hereafter NESC) and of the NATIONAL ELECTRICAL CODE (1981) (hereafter NEC) were introduced as evidence of a power company's obligations in installation, operation, and maintenance of power lines.
The NESC is published by the Institute of Electrical and Electronics Engineers, Inc. It purports to cover the "basic provisions for safeguarding persons from hazards arising from the installation, operation, or maintenance of ... overhead ... electric-supply... lines" and purports to contain the "minimum provisions considered necessary for the safety of ... the public." One of the requirements of this Code is that the lines "shall be inspected from time to time at such intervals as experience has shown to be necessary." Any defects associated with compliance *135 with the Code revealed by the inspection are to be recorded if not promptly corrected. Additionally, those lines with recorded defects that endanger life or property "shall be promptly repaired, disconnected, or isolated." This Code also includes the rules concerning clearance of wires over tanks containing non flammables as well as other types of structures. According to Table 234-1 of the Code, the clearance for open supply-line conductors carrying 14,400 volts should be eight feet horizontally and eight feet vertically.
The NEC is sponsored by the National Fire Protection Association. It also recognizes the importance of inspection and the use of ordinary care in relation to installation and maintenance of electrical lines. The provisions in Table 515-2 of the NEC provide that electrical lines close to above-ground tanks should not be within ten feet of the shell, ends, or roof of the tanks.
The service lines in question were constructed and maintained in violation of the provisions of both Codes. As previously stated, the energized line closest to the oil tanks was two feet horizontally from the fill line attached to the nearest oil tank and three feet nine and three-eighths inches horizontally from the tank itself. It was five feet vertically from the fill line. These distances violate the provisions of both Codes.
These violations were obvious and easily discoverable by casual inspection. Although the electrical lines in this suit were maintained by the defendant from 1982 through and including the date of the accident, at no time were the violations corrected. In fact, there is no evidence that any inspections were performed. It does not matter whether the tanks were installed before or after the service lines. From 1982 until 1989, Beauregard Electric had both opportunity and obligation to inspect the scene and correct this obvious defect. It did not do so. Clearly Beauregard Electric breached its duty to the public in not exercising the utmost care to reduce the danger associated with these particular energized lines.

Scope of Protection Element
This inquiry is a question of policy as to whether the scope of the duty breached covers the particular risk to which the plaintiff was exposed. Faucheaux, 615 So.2d 289. As stated in Faucheaux,
Rules of conduct are designed to protect some persons under some circumstances against some risks. The scope of protection inquiry asks whether the enunciated rule extends to or is intended to protect this plaintiff from this type of harm arising in this manner. In determining the limitation to be placed on liability for defendant's substandard conduct, the proper inquiry is often how easily the risk of injury to plaintiff can be associated with the duty sought to be enforced.
Id. at 293-94 (citations omitted).
The duty to maintain energized power lines in such a way as to reduce hazards to life includes the risk that an individual might come into contact with them. The duty is designed to protect that individual from that contact. The distances required by the various industry codes were promulgated for that very purpose. Beauregard Electric's negligence was the legal or proximate cause of the plaintiff's injuries in this case.

Damages
Once the plaintiff is able to establish the four elements of the duty-risk analysis, damages must be proven. Roberts v. Benoit, 605 So.2d 1032 (La.1992). Because of the jury's decision on the negligence of Beauregard Electric, this issue was not addressed in the trial court. However, the record before us is complete and therefore we can now award damages. La.Code Civ.P. art. 2164; Casanova v. Ballard, 533 So.2d 1005 (La.App. 1 Cir.1988), writs denied, 537 So.2d 1163, 1165, 1166 (La.1989).
The plaintiff was first treated at the DeQuincy Memorial Hospital emergency room where the nurse on duty observed that his shirt was burned off and that he had blisters. Thinking the plaintiff had spilled acid on himself, the hospital personnel flushed his skin and placed him under a shower for fifteen minutes.
*136 He was transferred to Lake Charles Memorial Hospital on the same day of the accident and remained there until June 27, 1989. Ayres suffered burns over approximately twenty-eight percent of his total body surface which, according to Dr. Colpitts, "were essentially located to the lateral aspect of the left thigh, lateral aspect of the trunk and the axilla." Those on the trunk were "scattered over the anterior chest and the posterior back with the deepest area being in the axilla in the area ... on the lateral flank." The plaintiff sustained permanent scarring and disfigurement in addition to the physical and mental elements of his injuries. Additionally, he sustained a left shoulder injury diagnosed by Dr. Thomas Ford, an orthopaedic surgeon, as posttraumatic bursitis. This injury will require surgery to correct.
While in the hospital the plaintiff began physical therapy which was continued after he left the hospital. He stayed under Dr. Colpitt's care until October 16, 1990, when the doctor concluded he reached maximum medical benefit but with residual scarring. By then he had undergone two skin grafts. The rest of the burns healed without surgical intervention.
We find the damages to be as follows:

General Damages $150,000.00
Past Medical Expenses 38,279.07
Future Medical Expenses 1,238.00
 ___________
 $189,517.07

Additionally, this award is subject to reduction for comparative negligence as assessed below.

Comparative Negligence
The jury found Beauregard Electric not at fault and therefore did not reach the question of apportionment of fault. Because we have the complete record before us, we will decide this issue. Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975).
Beauregard Electric breached a duty owed to the plaintiff, and the breach of that duty was a legal cause of the accident and resulting injuries. However, Ayres' inattentiveness in performing his job was also a cause of the accident. The supreme court in Faucheaux stated:
In assessing the negligent conduct of the two parties, various factors may influence the degree of fault assigned to each:
"(1) Whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) How great a risk was created by the conduct, (3) The significance of what was sought by the conduct, (4) The capacities of the actor, whether superior or inferior, and (5) Any extenuating circumstances which might require the actor to proceed in haste, without proper thought." Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967, 974 (La.1985).
Faucheaux, 615 So.2d at 294.
Ferguson, Clayton, and Jackson all acknowledged the danger associated with high energy lines. Beauregard Electric had the responsibility of maintaining the line for years, and the accident occurred when Ayres made his first trip to the scene. Ferguson acknowledged that he would not have constructed the lines on the same side of the road as the tanks because it stands to reason significant activity would occur around the wires. Still, Lueck recognized that the lines were in close proximity to the tankssomething the plaintiff should have noticed. Applying these factors to the activity of the plaintiff and Beauregard Electric in this case, we apportion the fault in causing this accident at seventy percent for Beauregard Electric and thirty percent for Ayres.

DISPOSITION
For the foregoing reasons, we reverse the judgment below and award Ayres $189,517.07 in damages, together with legal interest from date of judicial demand until paid, subject to a reduction of thirty percent for the comparative fault of Ayres. We assess costs of this appeal to the defendants.
REVERSED AND RENDERED.