694 So.2d 1195 (1997)
Virgie WILLIAMS, Dewayne Williams and Inetha Gibbs
v.
Dremaine DEAN, Economy Fire and Casualty Insurance Company, Parish of East Baton Rouge and City of Baton Rouge.
Faith BAREFIELD and Dremaine Dean
v.
INTERSTATE GUARANTY INSURANCE COMPANY, Economy Fire and Casualty Insurance Company, Parish of East Baton Rouge and City of Baton Rouge.
Dremaine DEAN and Faith Barefield
v.
The PARISH OF EAST BATON ROUGE, the City of Baton Rouge, and Economy Fire and Casualty Insurance Company.
Nos. 96 CA 1481 to 96 CA 1483.
Court of Appeal of Louisiana, First Circuit.
May 9, 1997.
*1196 James R. Coxe, III, Baton Rouge, for Plaintiffs/Appellees Virgie Williams, Dewayne Williams, and Inetha Gibbs.
Frank J. Gremillion, Baton Rouge, for Defendants/Appellants City of Baton Rouge and East Baton Rouge Parish.
Arthur R. Thomas, Baton Rouge, for Plaintiff/Appellee Faith Barefield.
John Brumfield, Baton Rouge, for Plaintiff/Appellee Dremaine Dean.
Richard Reed, Baton Rouge, for Defendant/Appellee Economy Fire & Casualty Insurance Company.
C. Michael Futrell, Baton Rouge, for Defendant/Appellee Interstate Guaranty Insurance Company.
Lawrence B. Sandoz, III, Opelousas, for Intervenor/Appellee Southern United Fire Insurance Company.
Before CARTER, LeBLANC and PARRO, JJ.
CARTER, Judge.
This appeal arises out of a trial court judgment in three consolidated actions for damages resulting from a multi-vehicular collision at the intersection of North 38th Street and Winbourne Avenue in Baton Rouge, Louisiana.

FACTUAL BACKGROUND
Winbourne Avenue is a four-lane, east-west thoroughfare. North 38th Street is a two-lane, north-south street. The intersection of Winbourne Avenue and North 38th Street is controlled by two semaphore traffic signals.
On March 13, 1993, shortly after 6:00 p.m., the Department of Public Works for the City-Parish of East Baton Rouge (City-Parish) received a report that the traffic signal *1197 at the intersection of Winbourne Avenue and North 38th Street had a "red bulb out." The City sent Richard "Danny" Crochet to repair the light. When Crochet arrived, the traffic signal appeared to be operating properly so he did not further inspect or repair the traffic signal.
On March 14, 1993, at approximately 2:24 a.m., Baton Rouge Police Officer Noel J. Salamoni reported to the City-Parish that there was a problem with the traffic signal at the intersection of Winbourne Avenue and North 38th Street. Officer Salamoni advised that the red lights controlling North 38th Street were not working. In his report to the City-Parish, Officer Salamoni reported:
On 38th northbound at Winbourne. Both of the red light bulbs are out. I need you to get them to change it as soon as possible. It will cause a wreck. (Emphasis added.)
After making his report, Officer Salamoni left the scene.
Shortly thereafter, at approximately 2:40 a.m., Dremaine Dean was operating a 1992 Buick Regal in which Faith Barefield was a guest passenger. The Dean vehicle was proceeding north on North 38th Street. When the Dean vehicle entered the intersection with Winbourne Avenue, it was struck by a vehicle owned by Michael W. Traylor and operated by Paul LeBlanc. The LeBlanc vehicle was proceeding east on Winbourne Avenue at its intersection with North 38th Street. As a result of the collision, the Dean vehicle was pushed into the path of another vehicle proceeding west on Winbourne Avenue. The other vehicle was a 1989 Plymouth Reliant owned by Virgie Williams and operated by Dewayne Williams. Inetha Gibbs was a passenger in the Williams vehicle. As a result of this accident, Dewayne Williams, Inetha Gibbs, Faith Barefield, and Dremaine Dean sustained personal injuries, and Virgie Williams sustained damages to her automobile.
On August 17, 1993, Virgie Williams, Dewayne Williams, and Inetha Gibbs (collectively referred to as Williams) filed an action for damages in the 19th Judicial District Court, Division D, under docket number 397,442. Named as defendants in the Williams suit were Dremaine Dean,[1] Economy Fire and Casualty Insurance Company (Economy), the Parish of East Baton Rouge, and the City of Baton Rouge (the City of Baton Rouge and the Parish of East Baton Rouge will be referred to collectively as the City-Parish). Williams alleged that the City-Parish was strictly liable for the malfunctioning traffic signal and that the City-Parish and Dean were at fault in causing the accident. The allegations of negligence against the City-Parish arose out of its maintenance of the traffic signal; the allegations of negligence against Dean arose out of his operation of his automobile. Williams also alleged that Economy issued a policy of liability insurance covering the automobile which Dean was operating and that Dean was a covered driver under the Economy policy. Williams subsequently amended the original petition, averring that LSA-R.S. 9:2800 (the statute limiting liability for public bodies) is unconstitutional.
Southern United Fire Insurance Company (Southern) filed a petition of intervention in the Williams suit. Southern alleged that it issued a policy of automobile insurance to Virgie Williams covering the 1989 Plymouth Reliant and paid her $2,525.00 in collision damage. Southern requested reimbursement of this sum from Dean, Economy, and/or the City-Parish.
Economy answered the Williams' petition, generally denying the allegations contained therein. Economy further averred that its policy did not afford coverage to Dean and that Dean's vehicle was not covered under its policy. Economy also answered Southern's intervention, generally denying the allegations.
The City-Parish answered Southern's intervention petition, denying the allegations and averring that Dewayne Williams was negligent in his operation of his vehicle, thereby reducing any liability which the City-Parish might have to Southern.
*1198 On February 7, 1994, Faith L. Barefield and Dremaine Dean (collectively referred to as Barefield) filed a petition for damages in the 19th Judicial District Court, Division H, under docket number 403,065. Named as defendants in the Barefield suit were Interstate Guaranty Insurance Company (Interstate),[2] Economy, and the City-Parish. Barefield alleged that the City-Parish was strictly liable for the malfunctioning traffic signal and that the City-Parish and Traylor were at fault in causing the accident.[3] The allegations of negligence against the City-Parish arose out of its maintenance of the traffic signal; the allegations of negligence against Traylor arose out of his operation of his automobile. Barefield also alleged that Economy issued a policy of liability insurance covering the automobile which Dean was operating and that Dean was a covered driver under the Economy policy.
Interstate answered the Barefield petition, generally denying that anyone for whom it may be responsible was guilty of negligence. Interstate also filed a cross-claim against the City-Parish, alleging that the City-Parish was solely at fault in causing the accident under theories of negligence and strict liability.
On March 14, 1994, Dremaine Dean and Faith Barefield (collectively referred to as Dean) filed a petition for damages against the City-Parish and Economy in the 19th Judicial District Court, Division I, under docket number 404,107. The Dean petition alleged that the accident was caused by the fault of the City-Parish in failing to properly maintain the traffic signal and in failing to take the necessary precautions to secure the intersection. The City-Parish answered the petition, generally denying the allegations of the petition and alleging that the accident was caused solely by the fault of Dean.
On April 18, 1994, Williams filed a motion to consolidate their action with the actions filed by Barefield, LeBlanc,[4] and Dean. By order, dated April 28, 1994, the Barefield and Dean actions were transferred from Divisions H and I, respectively, to Division D and were consolidated with the Williams and LeBlanc actions. Various other responsive pleadings and cross-claims were filed in these actions before and after consolidation.
A trial on the merits was held on November 10, 1995. The trial judge took the matter under advisement and rendered judgment in favor of Virgie Williams and against the City-Parish for $500.00, plus legal interest from date of judicial demand and all costs. The trial court also rendered judgment in favor of Dewayne Williams and against the City-Parish for general damages of $8,500.00, medical expenses of $1,592.80, and lost wages of $255.00, plus legal interest from date of judicial demand and all costs. Judgment was rendered in favor of Inetha Gibbs and against the City-Parish for $16,500.00 in general damages, $2,413.72 for past medical expenses, $2,500.00 for future medical expenses, and $399.76 for lost wages, plus legal interest from date of judicial demand and all costs. Judgment was also rendered in favor of Dremaine Dean and against the City-Parish for $8,500.00 in general damages and $2,660.25 for past medical expenses, plus legal interest from date of judicial demand and all costs. The trial court further rendered judgment in favor of Faith Barefield and against the City-Parish for $20,000.00 in general damages and $4,383.00 in medical expenses, plus legal interest from date of judicial demand and all costs. Judgment was rendered on Southern's intervention claims in favor of Southern and against the City-Parish in the amount of $2,525.00, plus legal interest from date of judicial demand and all *1199 costs.[5]
After the trial on the merits, Williams filed a rule to fix and tax as costs the cost of various depositions and medical reports. On April 29, 1996, the trial court rendered judgment in favor of Williams and against the City-Parish for $3,017.35.[6]
From this adverse judgment, the City-Parish appealed, contending that the trial court erred in the following respects:[7]
1. In finding that the City-Parish had adequate "notice" or knowledge of the internal problem with the traffic light and in finding that the City-Parish had a reasonable opportunity to repair the light prior to the accident.
2. In finding that the traffic light and/or the intersection itself were "defective" within the meaning of Civil Code Article 2317, and presented an unreasonable risk of injury.
3. In finding that Mr. Crochet was negligent in not dismantling and discovering the problem with the light on the occasion of the first complaint, Saturday evening before the accident.
4. In finding that Officer Salamoni was negligent in not remaining at the scene and directing traffic until Mr. Crochet arrived.
5. In disregarding the testimony of an expert witness to the effect that the actions of Officer Salamoni were appropriate.
6. In finding that the City-Parish was 100% at fault, and in failing to find comparative negligence on the part of both Dremaine Dean and Dewayne Williams.
7. In failing to find that the collision was caused solely by the concurrent negligence of both Dremaine Dean and Dewayne Williams, or, alternatively, solely by the negligence of Dremaine Dean.

STANDARD OF REVIEW
In reviewing the evidence, we are guided by the manifest error-clearly wrong standard, which authorizes us to reverse a trial court's factual finding only if we find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. See Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La. 1993); Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, the reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. See Stobart v. State, Department of Transportation and Development, 617 So.2d at 882.
The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Where two permissible views of the evidence exist, the fact finder's choice between them cannot be clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882-83.

LIABILITY OF CITY-PARISH
The standard negligence analysis employed in determining whether to impose liability under LSA-C.C. art. 2315 is the duty/ risk analysis, which consists of the following four-prong inquiry:

*1200 I. Was the conduct in question a substantial factor in bringing about the harm to the plaintiff, i.e., was it a cause-in-fact of the harm which occurred?
II. Did the defendant(s) owe a duty to the plaintiff?
III. Was the duty breached?
IV. Was the risk, and harm caused, within the scope of protection afforded by the duty breached?
See Mart v. Hill, 505 So.2d at 1122; Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620, 622-23 (1972).
Under a duty/risk analysis, for a plaintiff to recover, all four inquiries must be answered affirmatively. As such, in order for damages to be imposed under a duty/risk analysis, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his or her conduct to a specific standard of care (the duty element); (2) the defendant failed to conform his or her conduct to the appropriate standard (the breach of duty element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of protection element); and, (5) actual damages (the damages element). See Campbell v. Louisiana Department of Transportation & Development, 94-1052, p. 5 (La. 1/17/95); 648 So.2d 898, 901; Mathieu v. Imperial Toy Corporation, 94-0952, pp. 4-5 (La. 11/30/94); 646 So.2d 318, 322; Roberts v. Benoit, 605 So.2d 1032, 1041 (La.1991), on rehearing, 605 So.2d at 1050, 1051 (La.1991). See also Thomas C. Galligan, Jr., "A Primer on the Patterns of Negligence," 53 La.L.Rev. 1509, 1510 (1993).

A. Duty and Breach
The existence of a duty is clearly a question of law. Faucheaux v. Terrebonne Consolidated Government, 615 So.2d 289, 292 (La.1993). The inquiry is whether the plaintiff has any lawstatutory, jurisprudential, or arising from general principles of faultto support the claim that someone owed him a duty. Faucheaux v. Terrebonne Consolidated Government, 615 So.2d at 292, citing Green, "The Causal Relation Issue and Negligence Law," 60 Mich L.Rev. 543, 562-63 (1962); Griffin v. Danos and Curole Marine Contractors, Inc., 94-1789, p. 6 (La.App. 1st Cir. 5/5/95); 655 So.2d 525, 528, writ denied, 95-1383 (La. 9/15/95); 660 So.2d 451; Ayres v. Beauregard Electric Cooperative, Inc., 94-811, p. 12 (La.App. 3rd Cir. 9/6/95); 663 So.2d 127, 134, writs denied, 95-2432, 95-2434 (La. 12/15/95); 664 So.2d 455.
Concerning the duty owed by the City-Parish, it is well established that its obligation to motorists is to maintain its highways in a reasonably safe condition and to remedy conditions creating an unreasonable risk of harm. Morris v. State, Department of Transportation, 94-2545, p. 5 (La.App. 1st Cir. 10/6/95); 664 So.2d 1192, 1195, writ denied, 95-2982 (La. 2/9/96); 667 So.2d 537; Pino v. Gauthier, 633 So.2d 638, 645 (La. App. 1st Cir.1993), writs denied, 94-0243, 94-0260 (La. 3/18/94); 634 So.2d 858, 859. Included within this duty is the obligation to maintain traffic control signals. Maeder v. Williams, 94-0754, p. 15 (La.App. 4th Cir. 11/30/94); 652 So.2d 1005, 1014. See Rick v. State, Through Department Transportation and Development, 619 So.2d 1149, 1153 (La. App. 1st Cir.1993), affirmed in part, reversed in part, 93-1776, 93-1784 (La. 1/14/94); 630 So.2d 1271.
In the instant case, there is no dispute that the traffic control signal at the intersection of North 38th Street and Winbourne Avenue was under the supervision and control of the City-Parish on March 13 and 14, 1993. Therefore, the City-Parish had a duty to properly maintain the traffic signal. Further, there is no dispute that, at the time of the accident, the traffic signal was malfunctioning by failing to display a red light to the northbound lanes of travel on North 38th Street.
Moreover, the testimony at trial revealed the following.
Darla Kay Reneau, an emergency dispatcher with the City-Parish, Department of Public Works, testified via deposition. According to Reneau, on March 13, 1993, at 6:02 p.m., she received a report from an Officer Bell in Communications that the red light was out at the intersection of North *1201 38th Street and Winbourne Avenue. Officer Bell had received the information from police unit number 110. Reneau noted that city police complaints are considered reliable and are given priority over citizen reports, which must be verified.
After receiving the complaint, at 6:04 p.m., Reneau radioed Richard "Danny" Crochet, an employee of the City-Parish signal shop. According to Reneau's log, Crochet arrived at the intersection of North 38th Street and Winbourne Avenue at 6:15 p.m. Reneau's log also noted that Crochet left the scene at 6:17 p.m. The dispatcher work order completed by Crochet failed to reveal his findings relative to the condition of the traffic light at the intersection of North 38th Street and Winbourne Avenue.
The traffic signal maintenance report for March 13, 1993, reveals that, at 6:10 p.m., Crochet received a call, reporting that the red traffic signal at the intersection of North 38th Street and Winbourne Avenue was out. The report reflects that the information was reported by the Department of Public Works. Upon his arrival at the intersection at 6:15 p.m., Crochet discovered that all lamps on the traffic signal were working properly. The traffic signal maintenance report for March 14, 1993, reveals that Crochet received another call at approximately 2:45 a.m. This call reported that the red traffic signal at the intersection of North 38th Street and Winbourne Avenue was working intermittently. The report reflects that the trouble was reported by the police department. Upon his arrival at the intersection at 3:30 a.m., Crochet discovered that the wiring on the signal was damaged. The wind would cause the wire to make and break the connection with the lights, resulting in the red traffic signal working only intermittently.
Crochet recalled that he responded to approximately thirty-two calls on March 13, 1993, and that the weather on that day was cold and windy. Crochet testified that, at approximately 6:10 p.m., he received a call from the dispatcher, reporting that the southbound signal head of the traffic signal at the intersection of North 38th Street and Winbourne Avenue was not illuminating the red signal. According to Crochet, when he arrived at 6:15 p.m., he drove around the intersection. Crochet expected to find a blown-out bulb. However, after observing the traffic signal from every direction for more than one cycle, Crochet determined that there was no malfunction with the traffic signal and that the report of the malfunction was incorrect. Crochet left the intersection approximately two minutes later. However, Crochet acknowledged that a complete cycle of the traffic signal takes approximately two to five minutes. Crochet also admitted that he could have utilized the bucket on his truck to inspect the traffic signal, but that he did not do so on the afternoon of March 13.
The following morning at 2:45 a.m., Crochet received another report of a traffic signal malfunction at the intersection of North 38th Street and Winbourne Avenue. When Crochet arrived, the accident giving rise to the instant litigation had already occurred. Upon examining the traffic signal, Crochet discovered that the wire which supplied electricity to the northbound and southbound red lights had broken. Crochet acknowledged that both of the calls he received relative to the problem with the traffic signal were caused by the wiring, which was not making contact on the first occasion and was broken on the second occasion. Crochet completed his repair in approximately fifteen minutes.
Officer Noel Salamoni, a uniformed patrolman with the Baton Rouge K-9 Division, testified that, at approximately 2:24 a.m. on Sunday, March 14, 1993, he traveled through the intersection of North 38th Street and Winbourne Avenue. Officer Salamoni described the intersection in question as well-lit. From approximately 100 to 150 feet, Officer Salamoni was able to view the intersection. As Officer Salamoni approached the intersection, he observed that the red light bulbs were out at the intersection. Upon making that observation, Officer Salamoni watched the traffic signal cycle to determine whether the remainder of the traffic signal was functioning. Thereafter, Officer Salamoni reported to the police dispatcher that the traffic signal controlling the northbound lanes of North 38th Street at Winbourne Avenue was out and that the traffic signal needed to be repaired as soon as possible. *1202 Officer Salamoni commented that "[i]t will cause a wreck."
In discussing the steps uniformed patrolmen take to secure an intersection when presented with a situation of this type, Officer Salamoni testified that, if the traffic is not busy, then an officer may stand at the intersection and turn on his red lights. Officer Salamoni noted that there were no light bars on his K-9 unit. As a result, he was unable to turn on his lights. However, Officer Salamoni testified that his K-9 unit possessed strobe lights and emergency flashers. Additionally, Officer Salamoni testified that, if the intersection has a lot of traffic, then the officer should remain at the intersection and direct traffic. According to Officer Salamoni, in order to alter the traffic signal and place it in the flashing mode, an officer needs a special key to access the control box. He, however, was unable to perform that function, because only traffic patrol officers have keys to the control boxes. Officer Salamoni testified that he did not remain on the scene after reporting the malfunction of the traffic signal, but assumed that it would not take long to dispatch a repairman to repair the malfunctioning traffic signal.
Officer Michael A. King, the uniformed patrol officer with the Baton Rouge City Police Department who investigated the accident, testified that the area of town where the accident occurred is heavily patrolled by the police department. Additionally, according to Officer King, there is not much traffic at the intersection at that time of the morning. Officer King noted that the area clubs and lounges are located north of the intersection and that the establishments are closed by 2:00 a.m.
George J. Armbruster, chief deputy with the Lafayette Parish Sheriff's Office, was permitted to offer opinion testimony relative to the propriety of Officer Salamoni's actions on the morning of March 14, 1993. According to Armbruster, upon observing a malfunctioning traffic signal, a law enforcement officer should consider his knowledge of the general area, the time of day, and the amount of traffic to determine whether he should remain and direct traffic or report the malfunction to the authorities and leave the intersection unguarded. Armbruster noted that, at 2:15 a.m., the traffic pattern would be reduced. Moreover, Armbruster opined that, based upon the information which he was provided, Officer Salamoni's actions in reporting the malfunction and returning to his regular duties were reasonable under the totality of the circumstances.
Based upon the evidence presented, it is clear that the City-Parish had a duty to maintain the traffic signal and that it breached that duty by failing to properly fulfill its repair responsibilities. The malfunction of the traffic signal had been reported to the City-Parish by a police officer. Although Crochet responded to the report of malfunction of the traffic signal on the evening prior to the accident, he performed only a cursory inspection of the traffic signal. He did not get out of his truck to inspect the traffic signal; he merely drove around the intersection and observed the signal cycle. Moreover, although Crochet testified that he watched the traffic signal cycle through more than one cycle, according to the logs, Crochet did not remain at the intersection long enough to observe the traffic signal complete even one cycle. The City-Parish's failure to repair the traffic signal under the particular facts and circumstances presented in the instant case constitutes a breach of its duty.[8]

B. Cause-In-Fact
This element of proof is basically factual; it relates solely to conduct, an act or omission that results in harm or damage to another. Ayres v. Beauregard Electric Cooperative, Inc., 663 So.2d at 131. Cause-in-fact is generally a "but for" inquiry. If the plaintiff probably would not have been injured but for the defendant's substandard conduct, such conduct is a cause-in-fact. Guzman v. State, 95-0957, p. 11 (La.App. 1st Cir. 12/15/95); 664 So.2d 1343, 1351; Ayres v. Beauregard Electric Cooperative, Inc., 663 So.2d at 131. In other words, the inquiry is whether the defendant contributed to plaintiff's *1203 harm. Hutzler v. Cole, 93-0486, p. 9 (La.App. 1st Cir. 3/11/94); 633 So.2d 1319, 1325, writ denied, 94-0850 (La. 5/13/94); 637 So.2d 1070. To the extent that the defendant's actions had something to do with the injury the plaintiff sustained, the test of a factual, causal relationship is met. Ayres v. Beauregard Electric Cooperative, Inc., 663 So.2d at 131.
Dewayne Williams testified that, in the early morning hours of March 14, 1993, he was proceeding west in the inside lane on Winbourne Avenue near its intersection with North 38th Street. At the time, Williams was travelling between 35 and 40 m.p.h.; the posted speed limit was 45 m.p.h. According to Williams, as his vehicle approached the intersection, the traffic signal controlling the westbound lanes of Winbourne Avenue changed from red to green. Williams did not observe any approaching traffic. As the Williams vehicle entered the intersection, Williams observed a northbound vehicle. At the time Williams first observed the Dean vehicle, it was approximately twenty feet from his vehicle. Williams attempted to stop, but the Dean vehicle struck his vehicle, pushing it into the outside lane. Williams admitted that there were no obstructions that would have prevented him from seeing the northbound traffic on North 38th Street, and that he did not look at the traffic approaching from that direction.
Inetha Gibbs testified that she was a passenger in the Williams vehicle. Gibbs stated that, when the Williams vehicle was approximately 100 feet from the intersection, she observed that the traffic signal was green for the westbound traffic on Winbourne Avenue. Gibbs testified that she did not see the Dean vehicle until it was upon them.
Dremaine Dean testified that, at approximately 2:00 a.m. on March 14, 1993, he was travelling north on North 38th Street. Dean stated that he was unfamiliar with the intersection and with the general area of Baton Rouge. According to Dean, he was proceeding at approximately 35 m.p.h. and his attention was focused on the road. Dean testified that he did not see the traffic light or the fixture for the traffic signal; he observed only darkness. Additionally, Dean testified that he did not look both ways before entering the intersection of North 38th Street and Winbourne Avenue because he did not observe the traffic signal, nor did he observe the approaching vehicle.
Officer King testified that he received a dispatch to a three-car accident on March 14, 1993, at approximately 2:48 a.m., and he responded to the scene at 2:51 a.m. His investigation revealed that the Dean vehicle was proceeding north on North 38th Street toward Winbourne Avenue. As the Dean vehicle entered the intersection, it was struck by the Traylor vehicle, which was proceeding east on Winbourne Avenue. The impact pushed the Dean vehicle into the path of the Williams vehicle, which was proceeding westbound on Winbourne Avenue. Officer King noted that all three vehicles were heavily damaged as a result of the collision. During his investigation, Officer King determined that the red traffic signal controlling the northbound traffic on North 38th Street did not illuminate. Officer King testified that the west view of a driver traveling north on North 38th Street may be obstructed by an apartment complex located four to five feet from the curb. Officer King explained that a northbound traveler would have to be at the intersection to view any eastbound traffic.
In the instant case, the evidence shows that a faulty wire caused the traffic signal to malfunction. There is no dispute that the traffic signal at the intersection of North 38th Street and Winbourne Avenue malfunctioned at the time of the accident, in that the red light for the northbound lanes of travel of North 38th Street did not illuminate. Upon observing no traffic signal, the driver on North 38th Street proceeded through the intersection. But for the malfunction, which failed to control the northbound lanes of North 38th Street, the accident probably would not have happened. Clearly, the City-Parish's failure to repair the traffic signal contributed to the accident and is a cause-in-fact of the damages sustained.

C. Scope of Protection
The scope of protection inquiry is a question of policy addressing whether the particular *1204 risk falls within the scope of the duty. See Faucheaux v. Terrebonne Consolidated Government, 615 So.2d at 293. "[T]he `ease of association' [test] ... melds policy and foreseeability...." Roberts v. Benoit, 605 So.2d at 1054. The duty/risk analysis is "highly fact-intensive" and the scope of protection inquiry "fact-bound." See Roberts v. Benoit, 605 So.2d at 1055. In Faucheaux v. Terrebonne Consolidated Government, 615 So.2d at 293-94, the court stated:
Rules of conduct are designed to protect some persons under some circumstances against some risks. The scope of protection inquiry asks whether the enunciated rule extends to or is intended to protect this plaintiff from this type of harm arising in this manner.... In determining the limitation to be placed on liability for defendant's substandard conduct, the proper inquiry is often how easily the risk of injury to plaintiff can be associated with the duty sought to be enforced. (citations omitted).
In the instant case, the City-Parish's duty to maintain traffic signals includes the risk that an individual might be injured in an accident which results from the malfunction of those signals. Here, the duty of the City-Parish is designed to protect these plaintiffs from such an accident. We find no legal error or manifest error in the trial court's conclusion on the scope of protection.
We have thoroughly reviewed the entire record and determine that the evidence supports the conclusion that the City-Parish was negligent in its maintenance of the traffic signal light in the instant case and, accordingly, is liable to the plaintiffs for the resulting damages.

NEGLIGENCE OF WILLIAMS AND DEAN
The City-Parish contends that the accident was caused solely by the negligence of Dean and Williams.
A motorist's duty of reasonable care includes the duty to keep his vehicle under control and to maintain a proper lookout for hazards. Williams v. City of Monroe, 27,065, p. 10 (La.App. 2nd Cir. 7/3/95); 658 So.2d 820, 830, writs denied, 95-1998, 95-2017 (La. 12/15/95); 664 So.2d 451, 452; Ly v. State Department of Public Safety and Corrections, 633 So.2d 197, 201 (La.App. 1st Cir.1993), writ denied, 93-3134 (La. 2/25/94); 634 So.2d 835. Generally, the duty of drivers entering uncontrolled intersections is governed by LSA-R.S. 32:121, which grants the right of way to the vehicle approaching from the right. In Soprano v. State Farm Mutual Automobile Insurance Company, 246 La. 524, 165 So.2d 308 (1964), the Louisiana Supreme Court held that the statutory right of way provided in LSA-R.S. 32:121 is inapplicable to situations involving three phase, four-sided semaphore signals, in place, but temporarily out of order. The court then delineated the rights and duties under those circumstances as follows:
A non-functioning, four-sided semaphore signal device at an intersection in plain view of an ordinary observant motorist imposes a duty of extreme caution on any motorist approaching or entering that intersection. To enter such an intersection without slowing down or stopping to ascertain whether the crossing can be negotiated in safety is imprudent and constitutes negligence in legal contemplation.
Soprano v. State Farm Mutual Automobile Insurance Company, 165 So.2d at 312.
Following the Soprano rationale, in Orazio v. Durel, 407 So.2d 75, 77 (La.App. 4th Cir. 1981), the Fourth Circuit Court of Appeal also determined that LSA-R.S. 32:122[9] was inapplicable when signal lights were inoperative, and instead applied the standard of care as enunciated in Soprano. In Gaudet v. Louisiana Department of Highways, 432 So.2d 867, 869 (La.App. 1st Cir.1982), this court also followed the Soprano test.
With regard to the alleged negligence of Williams, the evidence presented at trial showed that Williams was proceeding west on Winbourne Avenue near its intersection with North 38th Street. Williams was travelling below the posted speed limit of 45 m.p.h. As the Williams vehicle approached the intersection, the traffic signal controlling *1205 the westbound lanes of Winbourne Avenue was fully operational and displaying a green signal when Williams entered the intersection. Williams did not observe any approaching traffic. After Williams entered the intersection, he observed the Dean vehicle, but was unable to stop in time to avoid the collision. Inetha Gibbs corroborated Williams' testimony.
With regard to the alleged negligence of Dean, the evidence presented at the trial showed that Dean was proceeding north on North 38th Street. Dean was unfamiliar with the intersection and with that general area of Baton Rouge. Dean proceeded at approximately 35 m.p.h. and focused his attention on the road. Dean testified that he did not see the traffic light or the fixture for the traffic signal; he observed only darkness. Additionally, Dean testified that he did not look both ways before entering the intersection of North 38th Street and Winbourne Avenue because he did not observe the traffic signal, nor did he observe the approaching vehicle.
The facts herein indicate that neither party knew that the traffic signal device was inoperative. The accident occurred in the early morning hours under the cover of darkness. Dean was unfamiliar with the area of town and with the intersection. Moreover, Officer King testified that, because of the presence of an apartment complex on the southwest corner of the intersection, the west view of a driver traveling north on North 38th Street may be obstructed.
After considering this evidence, the trial court determined that neither Dean nor Williams was at fault in causing the accident. The evidence is clear that the traffic signal was not malfunctioning for Williams and that, when faced with a favorable traffic signal, he proceeded through the intersection. If we were sitting as the trier of fact, we may have determined that Dean's conduct was a contributing cause of the harm, however, we cannot substitute our own evaluations for those of the trial court, when the trial court's evaluations are also reasonable. We are of the opinion that the trial court was not manifestly erroneous in finding the City-Parish solely at fault. Dean exercised care in approaching the intersection, he was proceeding below the posted speed limit and was watching the roadway in an unfamiliar area. He could not have seen eastbound traffic until he was upon the intersection because of the obstruction on the corner. Consequently, we hold that the trial court did not err in refusing to find that Dean was negligent under the circumstances of this case.

CONCLUSION
For the above reasons, the judgment of the trial court is affirmed. The City-Parish is cast for all costs of this appeal, in the amount of $1,497.66.
AFFIRMED.
NOTES
[1] On November 5, 1993, a preliminary default was entered against Dean.
[2] The Barefield petition is devoid of any factual allegations regarding Interstate Guaranty Insurance Company.
[3] The Barefield petition alleged that Michael W. Traylor was operating the vehicle proceeding east on Winbourne Avenue and that Traylor failed to exercise extreme caution in proceeding through a non-functioning signal. However, the accident report clearly reflects that Traylor owned the vehicle proceeding east on Winbourne Avenue, but that Paul LeBlanc operated the vehicle.
[4] Paul LeBlanc and Michael Traylor also filed an action for damages against Dean, Economy, the City-Parish, and Interstate in the 19th Judicial District Court, Division D, under docket number 404,100. The record in that action was not made part of the record on appeal.
[5] The trial court rendered judgment in favor of the City-Parish and against LeBlanc and Traylor, rejecting their claims at their costs.
[6] The judgment for costs was also appealed under docket numbers 96 CA 1484, 96 CA 1485, and 96 CA 1486, decided on May 9, 1997.
[7] The only issues presented in these assignments of error are the liability of the City-Parish and the negligence of Dean and Williams.
[8] Since we agree with the trial court concerning this breach of the City-Parish's duty, we express no opinion on whether Officer Salamoni's actions were also a breach of duty.
[9] This statute governs the right-of-way for left-turning vehicles.